**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE No.  21-20111 (JJT) |
| | ) | |
| OLD CP, INC. & | ) | |
| SURI REALTY, LLC, | ) | |
| DEBTORS | ) | CHAPTER  11 |
| | ) | |
| OLD CP, INC. | ) | |
| PLAINTIFF | ) | ADV. PRO. No.  23-02020 |
| V. | ) | |
| | ) | |
| NOVO ADVISORS, LLC, | ) | March 17, 2026 |
| DEFENDANT | ) | |
| | ) | |

**MEMORANDUM OF DECISION AND THE TRIAL**
**COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Appearances
Jeffrey M. Sklarz, Esq.
Kellianne Baranowsky, Esq.
Green & Sklarz, LLC
One Audubon Street
Third Floor
New Haven, CT 06511
*Counsel for Old CP, Inc.*

Jeffrey A. Fuisz, Esq. (pro hac vice)       James M. Nugent, Esq.
Robert Franciscovich, Esq. (pro hac vice)   Harlow, Adams & Friedman, P.C.
Rebecca Maller-Stein, Esq. (pro hac vice)   One New Haven Avenue, Suite 100
Arnold & Porter Kaye Scholer, LLP           Milford, CT 06460
250 West 55th Street                        *Counsel for Novo Advisors, LLC*
New York, NY 10019-9710
*Counsel for Novo Advisors, LLC*

## 1. Introduction

On December 22, 2023, Old CP, Inc. ("Old CPI") commenced this Adversary Proceeding against Novo Advisors, LLC ("Novo"). (ECF No. 1) Old CPI alleged therein that it was entitled to judgment against Novo on seven counts of its Complaint:

1) Preferential Transfer Pursuant to 11 U.S.C. §§ 547, 550, and 551;

2) Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551;

3) Constructive Fraudulent Transfer Pursuant to the Connecticut Uniform Fraudulent Transfer Act (CUFTA), Conn. Gen. Stat. §§ 52-552e(a)(2) and 52-552f(a);

4) Breach of Fiduciary Duty as to the Pre-Petition BMO Payment;

5) Breach of Fiduciary Duty as to the Novo/CPI Engagement;

6) Breach of the Implied Covenant of Good Faith and Fair Dealing; and

7) Violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b, et seq.

A trial was held on August 11–14, 2025. During the trial, Novo moved for a directed verdict on all counts. The Court granted the motion solely as to Count One, but declined to grant a directed verdict as to the other six counts. (Memorandum of Decision Granting Judgment on Partial Findings as to Count One, ECF No. 120; 8/13/25 Transcript at page 107, line 24, through page 133, line 19[1]) Having reviewed

---

[1] Henceforth, references to one page of a transcript will be cited as: "[Date] Tr. [Page Number]:[Line Number]–[Line Number]." Where multiple pages of transcripts are referenced, they will be cited as: "[Date] Tr. [Page Number]:[Line Number] –[Page Number]:[Line Number]."

the remaining six counts, the docket[2] of this Adversary Proceeding and the docket of the Main Case, Case No. 21-20111, the evidence adduced at trial through the witnesses and exhibits, and the parties' briefs, including their post-trial proposed findings of fact and conclusions of law, the Court concludes that Old CPI is not entitled to judgment on Counts Two, Three, and Four, but is entitled to judgment in its favor on Counts Five, Six, and Seven. The rationale for this determination and the terms of the judgment are embodied herein.

## 2. Findings of Fact[3]

### 2.1 Pre-Bankruptcy Filing – Novo's Engagement with BMO

Carla's Pasta, Inc. ("CPI") was a business owned and operated by its founder, Carla Squatrito, an Italian-American entrepreneur, with the assistance of her two sons, Sergio and Sandro Squatrito. (Main Case – ECF No. 1[4]) Mrs. Squatrito formed CPI on November 9, 1978, and markedly grew the business over more than four decades. (MC – ECF No. 4, ¶ 4) CPI manufactured and distributed a wide variety of pastas and related food products. (ECF No. 1; 8/11/25 Tr. 78:18–22; 8/12/25 Tr. 8:3–5) Suri Realty, LLC ("Suri") was a wholly owned subsidiary of CPI. (MC – ECF No. 4, ¶ 19) Suri owned two adjoining parcels of real property in South Windsor, Connecticut, whereupon CPI operated its business. (*Id.*, ¶ 15, 19)

---

[2] The Court has taken judicial notice of the entire docket in this Adversary Proceeding (8/13/25 Tr. 184:24–185:4); and takes judicial notice of the entire docket of the Main Case, Case No. 21-20111.
[3] To the extent that any Findings of Fact stated herein are considered Conclusions of Law, they are adopted as such. To the extent any Conclusions of Law stated herein are considered Findings of Fact, they are adopted as such.
[4] Henceforth, any references to the docket in the Main Case (CPI's bankruptcy filing, Case No. 21-20111) will be cited as "MC – ECF No. X." References to the docket of this Adversary Proceeding will be cited as "ECF No. X."

BMO Harris Bank, N.A. ("BMO") and People's United Bank, National Association ("PUB"), served as CPI's Senior Lenders (and will be collectively referred to as the "Senior Lenders"). (Stip. ¶ 11) On October 4, 2017, CPI and Suri entered into the Third Amended and Restated Credit Agreement ("Third Credit Agreement") with the Senior Lenders, with BMO serving as a lender and PUB as an administrative agent, lender, and letter of credit issuer. (*Id.*) Together, "the Senior Lenders held a first priority security interest in, and lien on, substantially all of [CPI's and Suri's] assets, including a first priority mortgage on all properties," which included Suri's real estate. (*Id.*, ¶ 12)

In the Third Credit Agreement, CPI and Suri expressly agreed to reimburse BMO for certain expenses incurred in connection with the Senior Lenders' administration of the Agreement and with loans made thereunder. Specifically, Section 11.4(a) of the Agreement regarding these expenses and fees states:

> The Loan Parties shall pay . . . all out-of-pocket expenses incurred by . . . any Lender . . . (including the fees, charges and disbursements of any counsel for . . . any Lender . . . and shall pay all fees and time charges for . . . any Lender . . . in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made . . . hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans . . . .

(Exh. D1, p. 133–34) Accordingly, CPI and Suri were contractually required to reimburse BMO – one of the two Senior Lenders – for all expenses and fees that BMO incurred in enforcing its rights under the Third Credit Agreement. (*Id.*; Exh. P1, p. 2)

4

CPI and Suri ultimately "defaulted on their obligations under the [Third] Credit Agreement, which led to a series of forbearance agreements and modifications between [CPI, Suri,] and the Senior Lenders; the first of which was entered into on or about June 8, 2018." (Stip. ¶ 13)

By the summer of 2020, CPI was facing significant operational and financial difficulties. First, Mrs. Squatrito was less able to devote her time and attention to CPI due to her advanced age and health issues, as well as the advanced age and failing health of her husband, who was seriously ill and required her care and attention. (8/12/25 Tr. 13:2–5; 8/13/25 Tr. 151:13–17, 178:6–10) Second, although Sergio and Sandro worked at CPI and were heavily involved in CPI's operations, the brothers unfortunately had a tense relationship that limited their ability to communicate and collaborate when at work, and, thereby, fully assist Mrs. Squatrito. (8/12/25 Tr. 13:12–14) Third, the company encountered numerous and significant financial setbacks: it embarked on a costly manufacturing plant expansion (8/11/25 Tr. 187:11–14; 8/13/25 Tr. 157:5–10); but thereafter lost two key customers, Panera Bread and Applebee's, resulting in a staggering 50 percent deterioration in its top line revenues, (8/11/25 Tr. 187:7–10); and it faced profound business disruptions from the outbreak of the COVID-19 pandemic. (*Id.*, 188:23–25) As a result of these setbacks, CPI's capital needs expanded while its operational revenues precipitously shrunk. (*Id.*, 187:15–17) Accordingly, CPI began to experience a period of severe and mounting financial distress while its leadership deteriorated. (*Id.*, 44:13–25, 47:22–48:9; Stip. ¶ 13; Exh. D14)

On or about June 30, 2020, BMO's counsel, Chapman and Cutler LLP, engaged Novo on behalf of the Senior Lenders to perform a financial assessment of CPI. (Stip. ¶ 16) BMO sought to assess CPI's ongoing viability in relation to its exposure as one of CPI's Senior Lenders, given the financial distress CPI was experiencing. (Exh. P1, p. 2; Exh. P19, p. 15; Exh. D14; 8/11/25 Tr. 38:14–39:16) "Novo is a financial advisory firm that specializes in turnaround advisory, restructuring advisory[] services, chief restructuring officer ('CRO') services, interim CRO and interim chief executive officer services, crisis management, insolvency advisory, and various other restructuring and insolvency issues." (Stip. ¶ 15; 8/11/25 Tr. 36:6–24)

A retention letter (the "BMO/Novo Retention Agreement"), dated June 30, 2020, set forth the terms of its engagement. (Stip. ¶ 17) The BMO/Novo Retention Agreement was signed by Mr. Sandeep Gupta, Novo's Managing Partner and one of Novo's founding partners. (Exh. P1, p. 7; 8/11/25 Tr. 35:17–25) Therein, Novo agreed to provide the Senior Lenders with "certain financial advisory and consulting services . . . in relation to [CPI] and [Suri] . . . ." (Exh. P1, p. 2) Specifically, the scope of Novo's services included reviewing CPI and Suri's historical financial performance for 2018 and 2019, performing an assessment of the companies' 2020 business plans, determining the companies' viability and risks, and conducting a Liquidation Analysis of CPI.[5] (*Id.*) Mr. Gupta testified at trial that BMO engaged Novo "to assess whether there was an opportunity for there to be a viable business."

---

[5] Although Novo was hired to assess both CPI and Suri (Exh. P1, p, 2), the Liquidation Analysis and Lender Report appear to have focused primarily or solely on CPI. (Exh. D14)

6

(8/11/25 Tr. 38:14–22) Because BMO hired Novo to assess the Senior Lenders'
interest in CPI and Suri and protect its rights under the Third Credit Agreement,
CPI was contractually obligated to reimburse BMO for the expenses it incurred in
securing Novo's services pursuant to § 11.4(a) of the Third Credit Agreement. (*Id.*)

A material term of the BMO/Novo Retention Agreement was that both BMO
and Novo would be subject to a continuing confidentiality covenant. (*Id.*, 6–7;
8/11/25 Tr. 204:18–22) Attached to the Retention Agreement was Novo's Standard
Terms and Conditions. (Exh. P1, p. 6) Section 4 of the Standard Terms and
Conditions stated:

> Both parties agree that any confidential information received from the
> other party shall only be used for the purposes of providing or receiving
> Services under this or any other contract between us. Except as provided
> below, neither party will disclose the other party's confidential
> information to any third party without the other party's written consent.

(*Id.*, 7) The Standard Terms and Conditions contain no provision indicating when
the parties would be free from these confidentiality restrictions, nor does the
BMO/Novo Retention Agreement provide any such expiration date. (*Id.*) Mr. Gupta
testified at trial that he remains subject to the confidentiality restrictions thereby
imposed. (8/13/25 Tr. 176:7–17)

In July of 2020, Novo was onsite at CPI's facilities to perform its financial
assessment for the Senior Lenders. (Stip. ¶ 19) CPI was aware that Novo was a
financial advisory consultant for the Senior Lenders and that Novo was preparing a
report on its assessment for the Senior Lenders. (*Id.*) Novo completed its
assessment and compiled its findings in a report ("Lender Report"), dated July 29,

2020, which included its completed Liquidation Analysis. (*Id.*, ¶ 20; Exh. D14; 8/11/25 Tr. 46:22–24) In producing the Lender Report, Novo relied on information that CPI provided and its interviews with CPI's personnel. (8/11/25 Tr. 39:2–9)

The Lender Report opened with a disclaimer that it was prepared exclusively for the benefit of the Senior Lenders and that "[d]istribution of this report to persons other than the Senior Lenders and its affiliates is prohibited, except" when permitted by the Senior Lenders upon written request. (Exh. D14, p. 2) The Lender Report included an Executive Summary, in which Novo reported that CPI was facing "a steady decline in sales," declining margins, a strained vendor base, a lack of leadership within the organization, and disagreements on strategic direction among ownership. (*Id.*, 5) Novo concluded that "[d]espite these challenges, [CPI] has a viable baseline business and has numerous opportunities for near-term performance improvement." (*Id.*, 6) As mentioned, the Lender Report also included the completed Liquidation Analysis, which stated that CPI's "orderly liquidation value is projected at between $16.3 million and $22.3 million, with forced liquidation value projected at $14.1 million." (*Id.*, 7) Ultimately, Novo's assessment revealed that "under any type of liquidation," the Senior Lenders "stood to lose between" $16 and $24 million. (*Id.*; 8/11/25 Tr. 49:18–50:7) Unmistakably, the Lender Report did not reference any strategy for a reorganization under the ownership or management of any of the Squatritos.

For the services it performed for BMO in connection with this engagement, Novo contemporaneously issued three invoices to BMO through its counsel. (Stip.

¶ 22–23) Those invoices totaled $273,616.25 for services performed from June 12, 2020, to August 6, 2020. (*Id.*, ¶ 23) BMO did not pay Novo for those services until January 28, 2021. (*Id.*, ¶ 23, 41)

### 2.2 Pre-Bankruptcy Filing – Novo's Subsequent Engagement with CPI

In the early summer of 2020, Daniel Bender, another financial advisor, served as CPI's interim Chief Restructuring Officer (CRO)[6] and helped CPI navigate the serious financial distress it was experiencing. (*Id.*, ¶ 24; 8/12/25 Tr. 10:8–13, 25:25–26:9; 8/13/25 Tr. 219:13–16) As CPI's Interim CRO, Mr. Bender familiarized himself with CPI, started imposing more discipline in its operations, and helped CPI develop a restructuring plan while working with its attorney advisors. (8/12/25 Tr. 13:18–15:24)

During this time, CPI's restructuring and potential bankruptcy counsel was Attorney Eric Henzy of Zeisler & Zeisler, P.C. (Stip. ¶ 25) Attorney Henzy began representing CPI in October of 2019. (8/11/25 Tr. 7:18–22) Based in Connecticut, he is recognized as a leading restructuring attorney of wide and deep experience in

---

[6] "While not contemplated by the Bankruptcy Code, distressed companies often hire a chief restructuring officer or some other form of crisis management team as part of their restructuring. Often this is done in consultation with, or at the behest of, a distressed company's secured lenders. A chief restructuring officer generally serves in an officer capacity and reports to a company's chief executive officer or the board of directors. A chief restructuring officer also may possess responsibilities to report to creditor constituents and other stakeholders on a less formal basis. The hiring of a chief restructuring officer, also referred to as a CRO, is now common in complex chapter 11 cases." Who's Running the Company? Corporate Governance in the New Era of Chapter 11 (May 16, 2013), *at* AM. BANKR. INST. 15TH ANN. N.Y.C. BANKR. CONF. (2013).

"With the advent of the chief restructuring officer (CRO) role during the 1990s, the industry developed a point of view that management should focus intently on running the business during the restructuring process and let outside professionals, a CRO or advisers, handle the specialized aspects of the turnaround and legal processes." Martha E. M. Kopacz, *The Missing Link to Successful Company Turnarounds Balance Sheet Management Is Only Part of the Story*, AM. BANKR. INST. J. at 32 (Mar. 2014).

commercial bankruptcy matters and workouts. (8/12/25 Tr. 6:15–7:12) Attorney Henzy "typically represent[s] borrowers" and is familiar with the requirements for the retention of professionals in bankruptcy cases. (*Id.*) While he was retained, Attorney Henzy demonstrated a profound resolve to pursue bankruptcy strategies, if feasible, to save CPI, in whole or in part, for the Squatritos. (*Id.*, 21:4–23:21) He was equally interested in a potential restructuring of CPI, as opposed to its liquidation. (*Id.*, 18:7–19:14; 21:4–23:21) He worked confidently with Mr. Bender to stabilize CPI and formulate its strategy forward. (*Id.*, 12:4–15:24)

Mr. Bender, however, resigned on July 24, 2020. (Stip. ¶ 24) Attorney Henzy testified that Mr. Bender resigned due to the stress and difficulty that working with the Senior Lenders as CPI's Interim CRO entailed and also in response, in part, to criticism he received from the Senior Lenders and to the ongoing discussions the Senior Lenders had regarding whether he would be replaced as CRO with Novo. (8/12/25 Tr. 26:10–28:1) According to Attorney Henzy, Mr. Bender simply "had had enough." (*Id.*, 27:25)

Once Mr. Bender resigned, a foreseeable melee ensued as CPI sought to quickly secure a new CRO. The Senior Lenders urged CPI to expeditiously find a new CRO, subject to their approval. (*Id.*, 29:20–31:10, 33:23–34:8) The stakes were high, as CPI was still experiencing severe financial distress at this time, and as BMO decided it was "not in a position to consider providing additional funding [to CPI] and/or extend payment relief unless and until an acceptable CRO candidate is identified by [CPI] and an acceptable turnaround plan is in place." (Exh. P86, p. 1)

CPI's management alone did not possess the experience or strategic acumen to navigate a potential restructuring. Consequently, Attorney Henzy was "tasked with going out and finding a CRO." (8/12/25 Tr. 37:17) He took on this task quickly, finding CPI multiple CRO candidates the week of July 26 and scheduling interviews with each to take place early the following week. (*Id.*, 37:17–20; 8/13/25 Tr. 24:12–21; Exh. P34, p. 1) One candidate scheduled for an interview was Phoenix Executive Services, LLC ("Phoenix") – the company that CPI would later hire to replace Novo as its financial advisor and CRO.[7] (8/12/25 Tr. 53:8–17; 8/13/25 Tr. 24:12–21) Somewhere along the way, however, the idea of hiring Novo as CPI's CRO swiftly took hold and gained firm traction.

Evidence was adduced at trial demonstrating that it was originally CPI's idea to hire Novo as its new CRO. The same day that Mr. Bender resigned – July 24, 2020 – BMO's counsel sent an email to Attorney Henzy, copying PUB's counsel, stating:

> BMO understands that [CPI] has expressed interest in making a change with respect to [CPI's] CRO, and specifically is considering Novo Advisors for the position. To the extent that [CPI] might be seeking input from the Lenders on this issue, while BMO cannot speak for [PUB], please be advised that BMO is supportive of the proposed change . . . .

(Exh. P83, p. 4)

In a second email, sent the following week on August 5, 2020, BMO's counsel stated:

---

[7] As noted later in this Memorandum of Decision, when CPI had to find a new financial advisor and CRO after Novo terminated its engagement with CPI, CPI filed an application to hire Phoenix (MC – ECF No. 194) which this Court approved. (MC – ECF No. 326)

> At this juncture, based on the recent projections tendered by [CPI], BMO does not believe [CPI] has the liquidity to sustain itself through the process of interviewing and appointing a new CRO, let alone providing time for such a candidate to get up to speed and develop a viable plan for [CPI]. Consequently, *following a request made by [CPI] that [CPI] be permitted to retain Novo*, BMO advised that it would consent to [CPI's] request, as BMO finds Novo to be an acceptable CRO candidate and this would allow [CPI] to address its liquidity issues on a timely basis.

(Exh. P86, p. 1) (emphasis added)

Similarly, Mr. Gupta testified that "[a]t one point[,] [Mrs. Squatrito] had approached [him] directly and she had asked [whether he could] be [CPI's] CRO," to which he replied that Novo "would consider it, but [that] it wasn't [his] decision to make," and "that she needed to clear that [decision with] her counsel and the [L]enders." (8/13/25 Tr. 140:13–141:4)

Additionally, the Eighth Forbearance Agreement and Fourth Modification to Credit Agreement (which CPI and the Senior Lenders later entered into and which went into effect on November 1, 2020), in Section 7.8 entitled "Chief Restructuring Officer," stated that CPI "has determined, *freely and voluntarily, in the exercise of its independent business judgment* that the selection of Novo Advisors is in the best interest of [CPI as] the Borrower. Lenders give their consent to the retention of Novo Advisors." (Exh. D43, p.7) (emphasis added)

More abundant, credible, and compelling evidence was adduced at trial, however, conversely indicating that it was not entirely CPI's idea to hire Novo and that BMO instead adeptly pressured CPI to hire Novo. (8/12/25 Tr. 26:10–28:1, 46:17–47:7; 8/13/25 Tr. 24:11–21, 45:19–46:3, 97:17–98:19; 8/14/25 Tr. 25:25–26:12;

12

Exh. P84, p. 2; Exh. P91, p. 5, 7; Exh. D86 at 20:4–22:13 (ECF No. 111, Appx. A) (Deposition of Sandro Squatrito))

First, recall that Attorney Henzy asserted that the Senior Lenders, including BMO, had somehow already made it known to Mr. Bender that they wanted Novo installed as CPI's CRO prior to Mr. Bender's departure, indicating that BMO's interest in hiring Novo predated that of CPI. (8/12/25 Tr. 26:10–28:1)

Second, counsel for PUB and Attorney Henzy both stated that CPI had not informed them that it planned to hire Novo as its new CRO. Counsel for PUB received the email from BMO on July 24, too, and replied before Attorney Henzy, writing: "[CPI] has not expressed any interest to PUB regarding a change of CRO." (Exh. P83, p. 3) Similarly, Attorney Henzy testified that he "didn't know what [BMO's counsel] was talking about" when he received the July 24 email from BMO. (8/12/25 Tr. 31:6–8) Accordingly, he wrote in reply to BMO's original email and PUB's response that the emails "have created great confusion for [CPI]" and requested a meeting to be held for CPI's management and the Senior Lenders to confer on the issue. (Exh. P83, p. 2) These statements, consistently expressing a disturbing confusion and disbelief regarding BMO's assertions, cast doubt on whether it was truly CPI's "idea" to hire Novo as its new CRO. CPI apparently did not share this idea with its own counsel or PUB, and the idea itself caused CPI confusion according to Attorney Henzy. (*Id.*)

Third, when asked about the process CPI undertook to secure a new CRO upon Mr. Bender's resignation, Sandro Squatrito stated that, although CPI was

13

ready to "interview other potential CROs," it soon "felt like [CPI] really needed to hire Novo" and like "[BMO] wanted Novo" to be CPI's new CRO. (Exh. D86 at 20:4–22:13) Sandro stated that he believed BMO supported Novo's retention because BMO and Novo "had a working relationship" and because "Novo had already had the ability to deeply dive into [CPI]." (*Id.*, 20:6–19) Additionally, in his deposition, when discussing the process through which CPI ultimately hired Novo, Sandro gave no indication that it was CPI who first suggested hiring Novo.

Sandro did note that certain practical factors weighed heavily in favor of hiring Novo. For example, he stated that hiring Novo seemed like "the best path forward to save [CPI]" because Novo "already had a chunk of time in the building" and because Novo "appeared [to have] a better working relationship with the [Senior Lenders] than [Mr.] Bender did." (*Id.*, 21:10–22:6) Nevertheless, these statements illustrate the inevitable pressure that BMO's close ties to Novo imposed on CPI. They equally demonstrate CPI's inexperience and resulting underappreciation of the potential utility and centrality of the leadership of professional advisors besides Novo, who, if independent, would have been better situated to leverage or push back on the positions and strategies of the Senior Lenders.

Fourth, both Attorney Henzy and Mr. Craig Jalbert (who was later designated as CPI's Liquidating Custodian in its Chapter 11 Plan[8] and who therefore investigated CPI's decision to retain Novo) stated that they believed BMO

---

[8] See Part 2.3 of this Memorandum of Decision.

had pressured CPI to hire Novo. Attorney Henzy vehemently opposed Novo's retention, believing Novo was simply too conflicted to work for CPI following its work assessing CPI and advising the Senior Lenders. (8/12/25 Tr. 64:2–15; 34:11–35:19; 66:16–21) Nevertheless, in an email sent to counsel for BMO and PUB, Attorney Henzy wrote, "My client has decided to *accede* to the banks' demand that Novo be the CRO . . . ." (Exh. P84, p. 2) (emphasis added) Similarly, Mr. Jalbert testified that he thought "that [CPI's] shareholders and executives felt like they were being forced to take Novo." (8/13/25 Tr. 24:11–14) He continued, "[M]y feeling is that . . . [BMO] . . . was driving Novo at [CPI] and [CPI] felt like [it] had no choice." (*Id.*, 24:19–21, 97:21–98:5) Mr. Jalbert also stated at trial, "I think there was a lot of conversations going on and I think *BMO was kind of forcing Novo on to the debtor, Carla's Pasta.*" (*Id.*, 20:4–6) (emphasis added)

Fifth and finally, the evidence illustrated that the Senior Lenders outright rejected the alternative CROs that Attorney Henzy had proposed – even though one of them was later approved to serve as CPI's CRO once Novo terminated the Novo/CPI Engagement in February of 2021. As noted above, BMO's counsel stated that it would readily consent to Novo's engagement as CRO and that it believed CPI did not have "the liquidity to sustain itself through the process of interviewing and appointing a new CRO" other than Novo, nor through the process of that new CRO "develop[ing] a viable plan for [CPI]."[9] (Exh. P86, p. 1)

---

[9] Despite BMO's assertions that CPI did not have sufficient liquidity, Attorney Henzy's recommendation that CPI hire a different firm evidences his belief that CPI had enough liquidity to do so. (8/12/25 Tr. 65:4–24; Exh. D13, p. 2)

At trial, Mr. Jalbert testified that CPI "had three suggested [replacement] CROs" in addition to Novo, including Phoenix, but "BMO and PUB rejected at least two of them, [and they never got] to the third." (8/13/25 Tr. 24:12–21) Mr. Jalbert's assessments are echoed in his Expert Report, in which he wrote, "With its financial condition worsening and *with BMO rejecting out of hand other CRO candidates*, CPI relented to BMO and retained Novo." (Exh. P91, p. 5) (emphasis added) Similarly, Attorney Henzy stated that he "believed very strongly that there were alternatives [to Novo] that would have been much better for the Squatritos and for [CPI] and probably for other constituencies." (8/12/25 Tr. 53:8–17) Attorney Henzy further even testified that, "from [his] perspective, [the Senior Lenders] were not working in good faith" to identify an acceptable firm to serve as CPI's CRO. (*Id.*, 42:20–43:4) This evidence illustrates BMO's adept manipulation of the financial dynamics and time constraints that CPI was under. The potential alternative CROs that Attorney Henzy proposed were swiftly rejected as BMO increasingly pressured CPI to retain Novo.

The abundantly clear and convincing evidence presented at trial regarding these relational and financial dynamics that led CPI to hire Novo leads the Court to conclude that, even if Mrs. Squatrito may have first had the idea that CPI should hire Novo as its new CRO, and even if CPI preferred Novo because Novo had already gained some baseline knowledge about CPI and had a working relationship with the Senior Lenders, CPI was indeed pressured or indirectly manipulated by BMO, to a significant degree, to hire Novo as its CRO. The statements made by

16

BMO's counsel and by Mr. Gupta asserting that CPI sought out Novo were not corroborated by Sandro Squatrito, nor Attorney Henzy, nor Mr. Jalbert, all of whom were intimately familiar, or became intimately familiar, with CPI's transition process.

Attorney Henzy so strongly advised CPI that it should not hire Novo as its CRO because he was aware that Novo maintained close ties to BMO. (8/12/25 Tr. 34:11–35:19, 64:2–15, 66:16–21) Attorney Henzy knew that Novo had not been hired by BMO to merely assess CPI as a stand-alone, one-off engagement, but that Novo also had an ongoing relationship with BMO as one of its approved financial advisors. BMO typically provided its borrowers with a list of two to three pre-approved financial advisors. (8/13/25 Tr. 136:21–137:16) When one of BMO's borrowers needed financial advice, they would select a financial advisor from that list to work with. (*Id.*) Novo was one such approved financial advisor.[10] (*Id.*) Through this arrangement, Novo had worked with BMO's borrowers on "five or six prior engagements" before working with CPI. (*Id.*, 136:21–137:2; 8/11/25 Tr. 38:10–13) Furthermore, in CPI's later filed Application to Employ Novo Advisors, LLC as Financial Advisor and CRO to Debtors, dated February 16, 2021, Mr. Gupta's declaration stated that Novo maintained an "institutional relationship with BMO . . . ." (MC – ECF No. 123-2, p. 5) Mr. Gupta further declared that "Novo is not providing any further services to BMO in connection with [CPI] or these Chapter 11

---

[10] It is logical and common sensical that, aside from competence, the Senior Lenders would approve advisors with which they could likely work with, as opposed to fight with, because of the debtors' competing reorganization goals.

17

cases, and Novo's fees and expenses for work done for [CPI] is paid solely by [CPI]." (*Id.*) Mr. Gupta did not declare, however, that Novo would not provide any further services to BMO in connection with *other* borrowers while simultaneously representing CPI. (*Id.*) Accordingly, this Court finds that Novo maintained, and understandably sought to preserve, its close ongoing business relationship with BMO.

Attorney Henzy was adamant that it was incredibly problematic for Novo, who enjoyed this close "institutional relationship" with BMO, to then represent CPI and serve as its officer, thereby captaining its strategies through financial shoals. (MC – ECF No. 123-2, p. 5) He thought that the naturally adverse interests between BMO and CPI created a conflict of interest for Novo in accepting the Novo/CPI Engagement, as Novo would simultaneously be beholden to BMO (due to their ongoing relationship and prior work product (including its Liquidation Analysis), and the duty of confidentiality it owed to BMO) while guiding CPI (as its financial advisor and CRO). (8/12/25 Tr. 34:11–17, 65:4–24; Exh. D13, p. 1–3)

Further, Attorney Henzy believed that hiring Novo was manifestly problematic because Novo could not serve as CPI's CRO if CPI ultimately had to file for bankruptcy relief – an outcome that was not unforeseeable or unlikely – due to that same conflict of interest. (8/12/25 Tr. 34:11–35:19, 66:16–21; Exh. D13, p. 1–3) Specifically, Attorney Henzy concluded that the Jay Alix Protocol would prohibit Novo's employment as CPI's CRO in a Chapter 11 in the Second Circuit.[11] (8/12/25

---

[11] "[T]he core requirements of the [Jay Alix] Protocol include the following:

18

Tr. 35:3–19; Exh. D19, p. 1) Attorney Henzy expressed these concerns to CPI on more than one occasion (8/12/25 Tr. 51:4–6, 64:2–15; Exh. P88, p. 1); and other parties shared his concerns.[12] (Exh. P83, p. 1) Vulnerable and trusting, but deeply motivated by its strong desire "to keep their business and to [continue to] run their business," CPI engaged Novo as its CRO and financial advisor, despite these admonitions, to appease BMO.[13] (8/12/25 Tr. 16:3–7; Exh. D86, 17:3–4)

On August 7, 2020, CPI contracted with Novo for it to provide financial advisory services, and, through Mr. Gupta, Novo's principal, to serve as its new CRO.[14] (Stip. ¶ 26, 29; 8/11/25 Tr. 67:4–10) CPI and Novo accordingly signed a

---

(a) the firm sought to be retained must serve in only one capacity (*i.e.*, as either a financial advisor, crisis manager, claims agent, or investor);
(b) the firm's retention application must be filed under section 363 of the Bankruptcy Code and the application must disclose the firm's relationships with interested parties and make other disclosures showing the firm is otherwise disinterested;
(c) the firm must file monthly staffing reports, which must be subject to Court review; and
(d) retention of persons furnished by the firm must be approved by and act under the direction of an independent board of directors."

*In re Nine West Holdings*, 589 B.R. 679, 688 (Bankr. S.D.N.Y. 2019).

The Jay Alix Protocol is not a law or "a provision of the Bankruptcy Code," nor is it "binding on this Court or any other Court." *Id.*, 687–88. Nevertheless, "[r]equiring parties to comply with the [Jay Alix] Protocol has served as a way to avoid conflicts of interest." *Id.*, 688.

Accordingly, the Protocol has been consistently applied in the Second Circuit. *Id.*, 687–88; *In re K.G. IM, LLC*, 620 B.R. 469, 486 (Bankr. S.D.N.Y. 2020); *In re Genever Holdings, LLC*, No. 20-12411-JLG, 2021 WL 3919826, at *13 (Bankr. S.D.N.Y. Sept. 1, 2021); *In re Saint Vincents Cath. Med. Ctrs. of N.Y.*, No. 05 B 14945 (ASH), 2007 WL 2492787, at *14 (Bankr. S.D.N.Y. Aug. 29, 2007).

[12] On July 24, 2020, Attorney Henzy sent an email to counsel for PUB stating that, should a Chapter 11 reorganization take place, "it should not be Novo" that "takes Dan Bender's place" as CRO. (Exh. P83, p. 1–2)

PUB's counsel replied that same day, writing, "I think an 11 is inevitable. There's no way Novo can get approved to run [CPI] in an 11. I don't see how they can possibly get over the conflict of interest issue." (*Id.*, p. 1)

[13] Attorney Henzy further testified that the Squatritos' objective "continued to be to try to keep the company. That . . . was a driver in some of the decisions that . . . were made. I think they still had a hope – I know Carla did, very, very strongly want . . . to try to keep the company." (8/12/25 Tr. 28:19–29:1)

[14] No distinct retention agreement was signed between Mr. Gupta and CPI. At all times, Mr. Gupta served under the Novo/CPI Engagement Contract on Novo's behalf as its principal and Managing Partner.

19

written agreement (the "Novo/CPI Engagement Contract") memorializing the terms of the retention. (Exh. P4) Therein, Mr. Gupta was authorized to serve as CPI's CRO, to exercise "his business judgment" on CPI's behalf, "to hire and terminate employment that leads to improved and sustained business performance," and to "[d]evelop a long-term business plan and strategy for the Company," among other things. (*Id.*, 1) While Mrs. Squatrito still "had final say on things" on behalf of CPI (8/12/25 Tr. 12:25–13:5); Mr. Gupta, as CRO, "became an officer of [CPI]" and received "specific authority to take actions on behalf of [CPI] . . . ." (8/11/25 Tr. 56:21–57:4) Novo, similarly, was authorized to "[m]ake personnel changes and adjustments based on [its] business judgment to improve . . . operating costs," "[w]ork closely with the sales organization to develop [CPI's] sales pipeline," and "[p]erform an assessment of the outstanding accounts payable, identify all critical vendors, and develop payment plans for continued support of [CPI]," among other things. (Exh. P4, p. 2)

Despite Attorney Henzy's concerns that Novo could not serve as CRO should CPI file for bankruptcy relief, the Novo/CPI Engagement Contract also provided that Novo would assist CPI "in developing a proactive public relations and communications program to ensure an orderly Chapter 11 process." (*Id.*, 3, 5–6) The Engagement Contract expressly contemplated how Novo would be compensated in the event of a bankruptcy filing.[15] (*Id.*, 5–6) No admonitions, cautions, or warnings

---

[15] The Contract states:

> In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment

concerning Novo's ability to continue to serve in any foreseeable Chapter 11 appear in the Engagement Contract.

Remarkably, Mr. Gupta made no effort to directly address or forthrightly confront with CPI (or Attorney Henzy) these specific concerns regarding a potential Chapter 11 case, nor broader concerns about an actual, potential, or perceived conflict of interest. When asked at trial whether he *would have* answered CPI's questions about any potential conflicts if asked, Mr. Gupta replied, "Of course," but he went on to state that he was never asked any such questions. (8/13/25 146:8–12) Furthermore, when asked at trial whether any "supplemental disclosures . . . were made to the Squatritos" regarding the Lender Report or Novo's relationship with and work for BMO, Mr. Gupta replied "the answer is no[,] . . . there was nothing else." (*Id.*, 178:24–179:9) Additionally, Mr. Gupta stated that, after CPI retained Novo and as "bankruptcy became more probable," he had discussions with those at CPI "concerning [his] ability to be retained as a professional in a bankruptcy," but that no "additional disclosures concerning any conflicts of interest" were made to CPI at that time. (8/11/25 Tr. 131:19–132:12) Accordingly, Novo and Mr. Gupta appear to have comfortably given scant substantive direction to CPI regarding any

---

of interim fees during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

(*Id.*, 5–6) Three more paragraphs follow discussing in detail how Novo will be compensated in the event that CPI files for bankruptcy.

21

conflicts of interest that would have affected their services as CPI's financial advisor and CRO, either before or after CPI retained Novo.

Instead, Novo has wholly relied on a conclusory waiver of conflict clause contained within the Novo/CPI Engagement Contract to ward against any conflict-of-interest issues. (*Id.*, 132:5–12; 8/13/25 Tr. 145:20–146:12) Attorney Henzy had previously advised CPI against signing such a waiver or release of claims against Novo or the Senior Lenders, but the Novo/CPI Engagement Contract contained such language. (8/12/25 Tr. 64:9–15; Exh. D13, p. 1–3) The alleged conflict waiver contained within the Novo/CPI Engagement Contract merely stated:

> Notwithstanding anything set forth in this section or any other sections or provisions of this Engagement Contract, Novo and [CPI] agree and acknowledge that Novo may fully, independently, and directly communicate with [CPI's] senior secured lenders and will share such communications with the Board of Directors as described in the Scope of Services. [CPI] acknowledges that Novo previously represented the senior secured lender(s) (Bank of Montreal and People's United Bank) of CPI, and *agrees to waive all previous conflicts[16] related to the prior lender engagement between Novo and the lender(s).*

(Exh. P4, p. 3) (emphasis and footnote added)

The same day that CPI retained Novo, illustrating his steadfast belief that Novo could not serve as CPI's CRO (due to its disabling conflict of interest) through CPI's financial distress and a potentially adversarial restructuring, Attorney Henzy resigned as CPI's legal counsel. (Stip. ¶ 25; Exh. P88, p. 1) In an email sent to explain his reasons for withdrawing, Attorney Henzy wrote, "BMO want[ed] Novo in [as CPI's financial advisor and CRO] because BMO believe[d that the] only viable

---

[16] The waiver notably does not waive current or future conflicts.

22

alternative here [to a proposed sale of debt was] liquidation" and thus, that Novo had only been hired "to wind [CPI] down." (Exh. D20, p. 1) According to Attorney Henzy, by agreeing to Novo's representation, CPI was "signing [its] own death warrant," and he "[could not]/[would not] represent [CPI] in signing [its] own death warrant."(*Id.*) Thus, consistent with his duties to CPI's goals and his ethical compass, he resigned. Novo made no independent inquiry of Attorney Henzy regarding the reasons for his resignation, nor did it seek to meet with him in that regard. (8/13/25 Tr. 161:5–20)

Nonetheless, from August 7, 2020, to March 1, 2021, Novo provided CPI with financial advisory services and the services of Mr. Gupta as its CRO. (Stip. ¶ 29) Novo and CPI were the contract parties and Novo issued CPI weekly invoices. (Exh. P4, p. 2, 5; Supp. Stip. ¶ 1–50) Throughout that time, Novo implemented performance improvements and helped further stabilize CPI. (8/11/25 Tr. 72:20–24, 108:2–11; 8/13/25 Tr. 162:1–13) Throughout Novo's engagement with CPI, however, Novo never shared the Lender Report with CPI. (8/11/25 Tr. 61:1–4, 180:17–22, 201:16–22; 8/13/25 Tr. 175:16–25, 223:25–224:6) Moreover, no evidence was adduced that Novo further explored or generated any potential refinancing or restructuring strategies for CPI.

During this time, CPI entered into three more forbearance agreements with its Senior Lenders:

1) the Sixth Forbearance Agreement, effective September 1, 2020;

2) the Seventh Forbearance Agreement, effective October 1, 2020; and

3)  the Eighth Forbearance Agreement and Fourth Modification to Credit

Agreement, effective November 1, 2020.

(Stip. ¶ 31–37) The Eighth Forbearance Agreement and Fourth Modification to

Credit Agreement (the "Eighth Forbearance Agreement") was the operative

agreement between CPI and the Senior Lenders on CPI's Petition Date. (*Id.*, ¶ 37;

Exh. D43) Although the agreement was effective as of November 1, 2020, the Senior

Lenders and Debtors entered into the agreement on January 5, 2021. (Stip. ¶ 36)

Pursuant to that agreement, the Senior Lenders advanced CPI $700,000 and

granted CPI additional forbearance of their remedies, among other things. (Exh.

D43, p. 4–6; 8/12/25 Tr. 166:17–167:7) CPI, in turn, "reaffirm[ed] its agreement

under the applicable loan documents," including the Third Credit Agreement, "to

pay or reimburse" the Senior Lenders for certain costs and expenses, among other

things.[17] (8/13/25 Tr. 85:6–86:13; Exh. D43, p. 15, § 13.14; 8/14/25 Tr. 48:20–49:19)

Although CPI and its counsel were principally involved in negotiating the terms of

these agreements with the Senior Lenders, Novo was involved "to the extent that

---

[17] Specifically, section 13.14, titled "Reimbursement of Costs and Expenses," states:

> Borrower agrees to pay all reasonable costs, fees, and expenses of Administrative
> Agent and any Lender (including reasonable attorneys' fees), expended or incurred by
> Administrative Agent or any Lender in connection with the negotiation, preparation,
> administration, and enforcement of this Agreement, the Loan Documents, the
> Obligations, any of the Collateral and all fees, costs, and expenses incurred in
> connection with any proceeding under any Debtor Relief Law (including, without
> limitation, any adversary proceeding, contested matter, or motion brought by
> Administrative Agent or any other Person). Without in any way limiting the foregoing,
> Borrower hereby reaffirms its agreement under the applicable Loan Documents to
> payor reimburse Administrative Agent and Lenders for certain costs and expenses
> incurred by Administrative Agent and Lenders in connection with the Loans. Carla's
> Pasta and Suri Realty are jointly and severally liable for their obligations under this
> Section 13.14.

(Exh. D43, p. 15, § 13.14)

[it] provided operating budgets and forecasts in support of" the negotiations. (8/11/25 Tr. 122:12–18; 8/13/25 Tr. 146:13–147:2)

Thus, under the Eighth Forbearance Agreement, CPI received additional funding and BMO's extended forbearance from exercising its rights and remedies against CPI. (8/13/25 Tr. 149:3–11; 8/14/25 Tr. 46: 8–11) Attorney Marc Heimowitz, who testified as an expert in strategic and financial consulting on Novo's behalf, when asked why CPI entered into the Eighth Forbearance Agreement, replied that CPI "would have likely [been] liquidated if they hadn't agreed to a forbearance agreement." (8/14/25 Tr. 45:24–46:17) Mr. Jalbert, when testifying on behalf of Old CPI as a fact witness in his capacity as Liquidating Custodian, simply acknowledged that he believed "that the [E]ighth [F]orbearance [A]greement was beneficial to CPI . . . ." (8/12/25 Tr. 167:20–168:3)

For its work as financial advisor *and* CRO during this timeframe, CPI paid Novo $1,167,036.00 (henceforth referred to collectively as the "CRO Payments"). (Stip. ¶ 30) CPI also made two payments to BMO via wire transfer for "payments related to bankruptcy" on January 28, 2021. (*Id.*, ¶ 38–40) The first payment was $164,169.75, and the second payment was $109,446.50, totaling $273,616.25 (henceforth referred to collectively as the "Pre-Petition BMO Payment"). (*Id.*, ¶ 38–39) Before CPI made the Pre-Petition BMO Payment, a $273,616.25 payment entry to Novo appeared on CPI's Accounts Payable Aging Spreadsheet. (Exh. P11, p. 11; 8/13/25 Tr. 171:1–13) When CPI ultimately made the Pre-Petition BMO Payment, Novo's Managing Director, Stefan Piotrowski, supervised and facilitated CPI in

25

making the payment. (Exh. P27; Exh. P44; Exh. P45; 8/11/25 Tr. 110:12–120:24 (discussing the email correspondence shown in Exhibits P27 and P44 and illustrating that Mr. Piotrowski coordinated the payment by conferring with Ms. Claudia McCann, CFO[18] of CPI, and Mr. Danish Khan, a Senior Servicing Analyst of BMO[19]))

Novo had previously sent BMO three invoices pertaining to the services it performed under the BMO/Novo Engagement in the summer of 2020. (Stip. ¶ 23) The total amount that BMO owed to Novo for those services totaled $273,616.25 – the same amount as the Pre-Petition BMO Payment. (*Id.*, ¶ 38–41) BMO, however, did not pay Novo for the services it performed in the summer of 2020 until January 28, 2021 – the same day BMO received the Pre-Petition BMO Payment from CPI to reimburse BMO for incurring those advisory expenses. (*Id.*, ¶ 23, 41)

### 2.3 The Bankruptcy Filing

On February 8, 2021, CPI filed its Chapter 11 Voluntary Petition (MC – ECF No. 1), commencing bankruptcy Case No. 21-20111. That same day, CPI also filed a Motion for Joint Administration With 20-21270 (MC – ECF No. 2), requesting its case be jointly administered with prior pending Case No. 20-21270, the bankruptcy filing of Suri, CPI's real estate affiliate.[20] On February 12, 2021, the Court granted

---

[18] 8/11/25 Tr. 68:2–6.

[19] Exh. P27, p. 3.

[20] On October 29, 2020, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against Suri. (Stip. ¶ 6–7) On December 17, 2020, Suri's involuntary Chapter 7 bankruptcy case was later converted to a voluntary case under Chapter 11 of the Bankruptcy Code. (*Id.*, ¶ 8)

the Motion for Joint Administration of the two cases in Chapter 11. (MC – ECF No. 91)

Alongside its bankruptcy petition, CPI filed a Statement of Corporate Resolution (MC – ECF Nos. 1 & 31), titled "Action by Unanimous Written Consent of the Board of Directors of Carla's Pasta, Inc.," dated February 5, 2021. Therein, the Board of Directors of CPI resolved that the Authorized Officers of CPI were:

> [A]uthorized and directed to continue to employ and seek to engage in the Chapter 11 Case Sandeep Gupta of [Novo] as its [CRO] to hold a senior managerial role in facilitating [CPI's] Chapter 11 Case, and Novo as its financial restructuring advisor to, among other things, assist [CPI] in evaluating its business and prospects, developing a long-term business plan, developing financial data for evaluation by its Board, creditors, or other third parties, in each case as requested by [CPI], evaluating [CPI's] capital structure, responding to issues related to [CPI's] financial liquidity, and in any sale, *reorganization*, business combination, or similar disposition of the Company's assets . . . .

(*Id.*) (emphasis added) On February 16, 2021, CPI filed an Application to Employ Novo Advisors, LLC as Financial Advisor and CRO to the Debtors, seeking to have Novo's continued assistance throughout the Chapter 11 bankruptcy. (MC – ECF No. 123)

Shortly thereafter, however, on February 28, 2021, Novo sent a letter to CPI stating that it was terminating its engagement with CPI as of March 1, 2021. (Stip. ¶ 43) Novo terminated the engagement because it belatedly acknowledged and manifested "concerns" about the conflict of interest Novo faced having previously worked for BMO and having ongoing obligations to BMO while representing CPI. (Exh. P36; 8/11/25 Tr. 175:1–11; 8/13/25 Tr. 161:21–162:13) In the Chapter 11

27

context, Novo could no longer hide nor minimize the impediments to its unfettered allegiance to the Debtors. In its termination letter, Mr. Gupta stated that CPI's then-current restructuring counsel[21] had informed Novo that its inability to share the Lender Report with CPI "creates a conflict of interest that would impede [Mr. Gupta's] appointment as [CPI's] chief restructuring officer and Novo's appointment as [CPI's] financial advisor in [CPI's] Chapter 11 bankruptcy case . . . ." (Exh. P25, p. 1) Novo also began to fear that other parties in interest – particularly the Official Committee of Unsecured Creditors and the U.S. Trustee – would object to Novo's retention as CRO due to the conflict-of-interest issues from Novo's work for and ongoing relationship with BMO.[22] (Exh. P36; 8/11/25 Tr. 175:1–11; 8/13/25 Tr. 161:21–162:13) Novo decided that its employment likely could not, or would not, be approved by the Court considering these anticipated objections. (Exh. P25, p. 1) The advice of CPI's then-current restructuring counsel echoed the concrete fears and consequences previewed by Attorney Henzy at the inception of CPI's pre-bankruptcy engagement of Novo and Mr. Gupta. Mr. Gupta also testified at trial that Novo decided to terminate the engagement not only because the conflict-of-interest issues arose and a backlash was anticipated concerning Novo's retention, but also because Novo had already "implemented so many performance

---

[21] CPI's counsel at the time was Adrienne Walker of Locke Lord LLP. (8/12/25 Tr. 139:24–140:3)

[22] The termination letter continued, "We also understand that the official committee of unsecured creditors recently appointed in [CPI's] Bankruptcy Case intends to oppose these appointments based on Novo's prior representation of the [Senior] Lenders. Although we believe that our engagement as requested in the current retention application can be approved by the Bankruptcy Court, any litigation of this issue would be costly, time-consuming and disruptive to [CPI] and Novo. As such, Novo believes that it is in the best interest of [CPI] and Novo to terminate the Engagement . . . so that [CPI] can immediately hire a replacement financial advisor and [CRO]." (Exh. P25, p. 1)

improvements" and felt as though it "had added as much value as possible . . . ." (8/13/25 Tr. 162:1–13) Novo resigned (reserving its right to payment) before any substantive objections to its retention were filed. When Novo unapologetically terminated its engagement with CPI, CPI then withdrew its application to employ Novo on March 1, 2021. (MC – ECF No. 193) Remarkably, Novo nonetheless persisted in endeavoring to seek payments from CPI for its interim services. (ECF No. 540) That Application was also withdrawn (MC – ECF No. 757; MC – ECF No. 759) in the face of imminent objections from the Court and the Official Committee of Unsecured Creditors. (ECF No. 653)

On February 24, 2021, CPI filed Schedule D upon the Court's docket, listing its secured creditors. (MC – ECF No. 161) There, CPI listed PUB and BMO as together holding a secured claim of $37,741,929.00. (*Id.*)

On March 1, 2021, CPI filed its Application to Employ Phoenix Executive Services, LLC as Financial Advisor and CRO. MC – ECF No. 194) On March 22, 2021, this Court entered its Order authorizing CPI to employ and retain Phoenix. (ECF No. 326) Joseph C. Nappi of Phoenix was therein designated as CPI's new CRO. (*Id.*)

On April 30, 2021, after an expeditious Section 363[23] sale process, CPI closed on an orderly liquidation sale of substantially all of its assets to CP Foods LLC and NFP Real Estate LLC for a base price of $24,891,123, subject to various adjustments, with this Court's approval. (MC – ECF No. 486, Exh. A, p. 18) The sale

---

[23] *See* 11 U.S.C. § 363.

left no operating business, no remaining ownership interests for the Squatritos, and obviously no restructuring of their business. After the sale closed, the proceeds were distributed in accordance with the Revised Sale Order (ECF No. 486), which included significant disbursements of the sale proceeds to the Senior Lenders. (*Id.*; MC – ECF No. 1658, p. 9)

On August 2, 2021, CPI's First Amended Chapter 11 Plan (MC – ECF No. 801) was confirmed. (MC – ECF No. 1054) Pursuant to the terms of the Plan, Craig Jalbert, a principal of Verdolino & Lowey, P.C. (a financial advisory and accounting firm) was appointed the Liquidating Custodian of the reorganized debtor (deemed Old CP, Inc.) and succeeded to substantially all the rights, powers, and duties of CPI.[24] Mr. Jalbert serves as Managing Partner at Verdolino & Lowey, where he works in the Distressed Business Area, assisting financially distressed individuals and companies, and also runs the firm's day-to-day operations. (8/12/25 Tr. 85:18–86:10)

The Plan authorized Mr. Jalbert, as Liquidating Custodian, to "investigate and prosecute any remaining Causes of Action, including Retained Causes of Action (as defined in the Plan), on behalf of the Debtors and their estates . . . ." (Stip. ¶ 50) Pursuant to those duties, Mr. Jalbert and his counsel investigated Old CPI's various

---

[24] On June 18, 2021, CPI filed its First Amended Chapter 11 Plan Before Confirmation. (MC – ECF No. 801) Therein, CPI provided that "[o]n the Effective Date, Craig Jalbert shall be designated as the Liquidating Custodian." (*Id.*, 22) On August 2, 2021, the Court entered its Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Liquidation of the Debtors. (MC – ECF No. 1054). In accordance with that Order, the Liquidating Custodian succeeded to substantially all rights, powers, and duties of CPI upon the Effective Date of the Plan. (Stip. ¶ 48) On August 17, 2021, the Effective Date of the Plan occurred, and Old CPI filed and service a notice thereof. (*Id.*, ¶ 49)

potential causes of action and commenced this Adversary Proceeding. (ECF No. 1)

Mr. Jalbert's investigation into other potential causes of action has now concluded.[25]

This Adversary Proceeding is the last residual asset of Old CPI that could be

monetized for distribution to creditors under the Confirmed Chapter 11 Plan.[26]

### 2.4 History of the Adversary Proceeding

On December 22, 2023, the Liquidating Custodian commenced this Adversary

Proceeding against Novo. (ECF No. 1)

On March 25, 2024, Novo filed a Motion to Dismiss. (ECF No. 21) Therein,

Novo contended inter alia that:

1. Old CPI's claims were barred by the doctrines of judicial and equitable

   estoppel;

2. Old CPI affirmatively waived and released the alleged conflicts and issues

   underpinning its claims; and

3. Old CPI failed to state a claim under any of its asserted theories.

On August 29, 2024, this Court denied Novo's Motion to Dismiss because Old CPI's

claims were not barred by doctrines of estoppel, the alleged conflicts had not been

definitively waived and released (particularly given that the Novo/CPI Engagement

Contract refers solely to previous conflicts and did not "release Novo from its

fundamental fiduciary duties to CPI as a company officer"), and Old CPI's

Complaint was factually sufficient to support its claims. (ECF No. 38)

---

[25] *See* PDF with Attached Audio File (ECF No. 13 at 05:22:00–05:28:00)) documenting where, at a Pre-Trial Conference held on February 29, 2024, counsel for the Debtor stated before the Court, "This is the last substantive item in this case other than distributions."
[26] *Id.*

On October 7, 2024, Novo filed its Answer to Complaint (ECF No. 46) wherein it largely denied the allegations and raised sixteen (16) affirmative defenses. The affirmative defenses raised were:

1. The complaint fails to state a claim upon which relief can be granted;

2. Plaintiff's claims are barred as the transfers were contemporaneous exchanges for value within the meaning of 11 U.S.C. § 547(c)(1);

3. Plaintiff's claims are barred, under 11 U.S.C § 547(c)(2), as Plaintiff cannot avoid any transfer by CPI to the extent that such transfers were in payment of debts incurred by CPI in the ordinary course of business;

4. Plaintiff's claims are barred because CPI received new value within the meaning of 11 U.S.C. § 547(c)(4);

5. Plaintiff is barred from avoiding any transfer made by CPI to the extent that such transfer did not allow another party to receive more than that party would have received in a case under chapter 7 of title 11 of the United States Code if the transfer had not been made;

6. Plaintiff's claims are barred to the extent the transfers were accepted for value and in good faith on account of debt validly owed within the meaning of 11 U.S.C. § 548(c);

7. Plaintiff's claims are barred because CPI received reasonably equivalent value in return for the alleged transfers within the meaning of 11 U.S.C. § 548(a);

8. Plaintiff's claims are barred because CPI suffered no damage, injury, or otherwise as a result of the transfers;

9. Plaintiff's claims are barred by the doctrines of waiver, release, equitable estoppel, judicial estoppel, and/or laches;

10. Plaintiff's claims are barred by the doctrine of earmarking;

11. Plaintiff's claims are barred by ratification;

12. Plaintiff's claims are barred by the doctrines of *in pari delicto* and equitable defenses;

13. Plaintiff's claims are barred because any recover[y] would constitute unjust enrichment;

14. If CPI suffered any damages (which Novo denies), such damages were caused or contributed to, in whole or in part, by CPI's own actions and/or omissions;

15. Plaintiff's claims are barred because Novo at all times acted in good faith and without malice, willfulness, recklessness, or evil intent; and

16. To the extent the Court finds that Novo is liable to Plaintiff, Novo is entitled to set-off for any and all amounts owed by CPI to Novo.

(ECF No. 46, p. 18–20) These defenses – excluding those that were already addressed in this Court's Memorandum of Decision and Ruling on Novo Advisors, LLC's Motion to Dismiss (ECF No. 38) and in this Court's Memorandum of Decision Granting Judgment on Partial Findings as to Count One (ECF No. 120) – will be addressed and largely rejected by this Court in the body of this Memorandum of Decision where appropriate and relevant.[27]

On October 30, 2024, Old CP filed its Response (ECF No. 48), responding to Novo's affirmative defenses, denying the allegations raised therein, and arguing that the defenses are meritless.

---

[27] The Court notes that Novo did not brief all its affirmative defenses. Accordingly, only those that were briefed will be addressed, as the Court deems the other defenses to have been abandoned. *See Francis v. Maldonado*, No. 3:14-CV-1875 (SRU), 2016 WL 30652, at *2 (D. Conn. Jan. 4, 2016) (deeming as abandoned claims that were not briefed throughout the duration of the case); *Burnette v. Carothers*, No. 3:94-CV-00420 (EBB), 1998 WL 136177, at *3 n.1 (D. Conn. Mar. 11, 1998) (same); *Clayton Servs. LLC v. Sun W. Mortg. Co., Inc.*, No. 3:17-CV-00172 (KAD), 2021 WL 2376619, at *12 n.15 (D. Conn. June 10, 2021), *aff'd*, No. 22-511, 2023 WL 2781294 (2d Cir. Apr. 5, 2023), and *aff'd*, No. 22-511, 2023 WL 2781294 (2d Cir. Apr. 5, 2023).

The Court considers Novo to have sufficiently briefed defenses 1, 6, 7, 8, 9, 10, 11, 12, 14, and 15 relating to the trial of the Counts addressed herein. To the extent not explicit herein, the defenses relating to Counts 5, 6, and 7 are herein rejected as overruled.

On March 28, 2025, in anticipation of trial, Novo filed six Motions in Limine. (ECF Nos. 64, 65, 66, 67, 68, 69) On May 20, 2025, after hearing and argument, the Court denied the Motions in a written ruling. (ECF No. 94)

### 2.5 Trial Testimony and Exhibits

The trial in this Adversary Proceeding was held from August 11 to 14, 2025, wherein the parties' arguments and evidence were presented to this Court. The Court admitted into evidence 49 exhibits proposed by the Plaintiff, and 48 exhibits proposed by the Defendant, in full or in part.[28] Prior to trial, the parties also submitted two sets of stipulated facts. (See Filing Parties' Joint Pretrial Statement (ECF No. 100, Exh. A, also ECF No. 60, Exh. A)[29]; Filing Parties' Supplemental Stipulated Facts (ECF No. 103)[30]) The stipulated facts were duly admitted into evidence and are expressly relied upon by this Court in its decision herein.[31]

Further, the Court has taken judicial notice of the entire docket in this Adversary Proceeding, as well as the entire docket of the Main Case, Case No. 21-20111. The Court is intimately familiar with the docket of both cases, the First

---

[28] The Plaintiff submitted a proposed list of exhibits. (ECF No. 99) The Court admitted exhibits: P1, P2, P3, P4, P5, P6, P7, P8, P9, P10 (for a limited purpose), P11, P12, P13, P14, P15, P18, P19, P20, P21, P22, P23, P25, P26, P27, P31, P32, P33, P34 (in part), P36, P40, P44, P45, P46, P48 (in part), P49, P57, P75, P76, P78, P83 (in part), P84, P86, P88, P91, P92, P93, P94, P97, and P98. (ECF No. 123)

 The Defendant submitted a proposed list of exhibits. (ECF No. 98) The Court admitted exhibits: D1, D2, D4, D5, D6, D7, D8, D9, D10, D11, D12, D13, D14, D15, D16, D18, D19, D20, D21, D22, D23, D35 (in part), D38, D40 (in part), D43, D45, D46, D47, D48, D54, D55, D57, D68, D75, D76, D77, D78, D79, D80, D81, D82, D83, D84, D85, D86, D90, D91, and D92. (ECF No. 124; ECF No. 111 (containing Exh. D86))

[29] When cited, this document is cited as "Stip. ¶ #."

[30] When cited, this document is cited as "Supp. Stip. ¶ #."

[31] The parties' stipulated findings of fact (contained in ECF No. 100 and ECF No. 103) are deemed, in their entirety, to be part of the record and accepted as findings of fact by this Court. Where material, certain stipulated facts are cited in the body of this Memorandum of Decision.

Amended Plan (MC – ECF No. 801) that this Court confirmed (MC – ECF No. 1009), and the Section 363 sale and liquidation process that CPI underwent and that this Court approved.

In its affirmative case, Old CPI called as a witness:

1. Old CP, Inc., by and through Craig Jalbert in his capacity as Liquidating Custodian, who testified credibly first as a fact witness, explaining his involvement and role with Old CPI as its Liquidating Custodian, the history of the bankruptcy filing and Chapter 11 case, and his knowledge of the books and records and operations of CPI and Old CPI;

2. Sandeep Gupta, who testified somewhat credibly about his role at Novo, his experience working as a consultant for BMO, the assessment of CPI that Novo conducted while consulting for BMO, and Novo's role as CPI's financial advisor and CRO prior to its bankruptcy filing;

3. Attorney Eric Henzy, who testified credibly about his experience serving as CPI's restructuring counsel until August 7, 2020, the actions he and CPI took in relation to that role, and his experience and opinions as a restructuring lawyer concerning Novo's retention; and

4. Craig Jalbert, who again testified credibly in his capacity as a financial restructuring expert on his Expert Report (Exh. P91), in which he opined on CPI's relationship with Novo, whether an actual conflict of interest existed between BMO and CPI, and whether (a) Novo's receipt of the Pre-Petition BMO Payment, and (b) the Novo/CPI Engagement, were

35

objectionable and impermissible due to the actual conflict of interest that he concluded existed.[32]

Mr. Jalbert was qualified as an expert financial advisor of distressed businesses and has consulted innumerable clients in the insolvency environment for over 35 years. (8/13/25 Tr. 7:19–8:8) Mr. Jalbert's expert opinion relied on his "education[,] training[,] and experience" as a principal of Verdolino & Lowey, P.C. and as a certified insolvency and restructuring advisor,[33] after "a detailed review of the records made available to date," including "a review of the docket of both the Bankruptcy Case and the Adversary Proceeding, a review of publicly available materials[,] and [his] discussions with [his] attorneys . . . ." (Exh. P91, p. 3) In considering whether a conflict of interest existed in Novo's engagement, Mr. Jalbert reviewed and cited various ethical standards, including the Model Rules promulgated by the American Bar Association,[34] the Rules promulgated by the American Institute of Certified Professional Accountants,[35] the Financial Industry

---

[32] Novo did not object to Mr. Jalbert's certification as an expert (8/13/25 Tr. 17:11–24); nor to the admission of his Expert Report. (Exh. P91; 8/13/25 Tr. 4:19–5:9)

[33] At trial, Mr. Jalbert attested that he has spent "35 or more [years] in the solvency/distressed business environment" and that he "ha[s] worked on thousands of bankruptcies, numerous federal and state receiverships, assignments for the benefit of creditors or assignee, and . . . hundreds of corporate winddowns." (8/13/25 Tr. 7:19–8:8)

[34] The American Bar Association states that a conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." A.B.A. 1.7, Conflicts of Interest.

[35] The Code of Professional Conduct promulgated by the Association of International Certified Professional Accountants (AICPA), section 1.100.01 (.01) states that "In the performance of any *professional* service, a *member* shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others." Ass'n Int'l Certified Pro. Accts. Code of Pro. Conduct (Dec. 15, 2014), p. 52 (emphasis in original). Thereafter, section 1.110.010 (.02) states, "A conflict of interest creates adverse interest and self-interest *threats* to the *member's* compliance with the" aforementioned requirement of 1.100.01 (.01) to maintain objectivity and integrity, to be free of conflicts of interest, and to not knowingly misrepresent facts or subordinate one's judgment to others. *Id.*, 53 (emphasis in original) The Code

36

Regulatory Authority's October 2013 report on conflicts of interests,[36] and the Code of Ethics issued by the Turnaround Management Association.[37] (*Id.*, 5–6) Mr. Jalbert relied on these standards for guidance in concluding that a conflict of interest "involves, inter alia, situations where the interests of two parties differ and can impair objectivity" and in further concluding that the Novo/CPI Engagement involved a conflict of interest. (*Id.*, 5, 7)

Mr. Jalbert ultimately concluded in his Expert Report that "BMO and CPI had clear adverse interests – a major conflict – because Novo was representing BMO in connection with the restructuring of CPI and, inter alia, had issued a report to BMO which it never shared with Novo, even after it [became] CPI's CRO." (*Id.*, 7) Mr. Jalbert further opined, "based on correspondence among CPI, BMO, [PUB,] and [Attorney Henzy,] CPI's then counsel," that "BMO made clear that Novo was effectively the only financial advisor that it would accept, and which CPI could hire given the time frames involved." (*Id.*) Mr. Jalbert finally opined that "Novo had a duty to disclose actual or perceived conflicts of interest to CPI," that the disclosure

cites, as an example of a situation wherein adverse interest and self-interest threats may arise, "the member or the member's firm provides a professional service related to a particular matter involving two or more clients whose interests with respect to that matter are in conflict." *Id.*

[36] An October 2013 report on Conflicts of Interest issued by the Financial Industry Regulatory Authority (FINRA), which addressed member firms' codes of conduct, cited one member firms' code approvingly. *Report on Conflicts of Interest*, FINRA (Oct. 2013) at p. 9. The member firms' code stated that staff "[s]hould avoid even the appearance of a conflict of interest and should disclose all material facts concerning any conflict that does arise with a client." *Id.*

[37] The standard of the Turnaround Management Association states that "a member's duty is solely to the client and he or she should strive to remain independent of other affiliations that could compromise his or her judgment or result in the appearance of compromise. Prior to accepting an engagement, a member shall disclose to his or her client all financial relationships which may cloud, or give the appearance of clouding, his or her judgment. If the client is the troubled business or organization, disclosure shall be made of any past referrals from, prior work for, or an ownership interest in, any owner, creditor or customer of the client and any party offering appearance of conflicts of interest." Turnaround Mgmt. Ass'n, Code of Ethics, Canon II, Sec. 2.2.

contained in the Novo/CPI Engagement Contract was "insufficient and one-sided," and that, regardless, "[g]iven the nature of the conflict, which contemplated an overlapping or consecutive representation of adverse parties coupled with the close professional and significant financial relationship between BMO and Novo, the conflict could not be waived." (*Id.*, 10) Mr. Jalbert concluded that "Novo was not acting in the best interest of CPI but rather in its own self interests." (*Id.*, 9)

In its defense, Novo called as a witness:

1. Sandeep Gupta, who again testified somewhat credibly about his role at Novo, his experience working with both BMO and CPI, the ethical obligations he owed to CPI, and his dismissive conclusions about whether a conflict of interest existed during his service to CPI as CRO and Novo's service generally as CPI's financial advisor; and

2. Marc Heimowitz, JD, CFA who testified somewhat credibly in his capacity as an expert about the Expert Report he created (Exh. D90), wherein he opined on Novo's relationship with BMO and CPI, the information CPI had about Novo's relationship with BMO, and the ultimate propriety of Novo's receipt of the Pre-Petition BMO Payment and decision to enter into the Novo/CPI Engagement.[38]

Attorney Heimowitz was qualified as Novo's expert with expertise in strategic and financial consulting to offer his opinion on five different areas: 1) to rebut the expert testimony of Mr. Jalbert; 2) to attest to the customs and standard

---

[38] Old CPI did not object to Attorney Heimowitz's certification as an expert (8/13/25 Tr. 208:8–10); nor to the admission of his Expert Report. (Exh. D90, D91, D92; 8/13/25 Tr. 182:15–183:4)

industry practice for financial restructuring advisory firms during the relevant time period; 3) to address the Lender Report; 4) to discuss Novo's conduct related to the Novo/CPI Engagement and Mr. Gupta's conduct as CRO; and 5) to opine on certain of CPI's conduct before and during its bankruptcy filing. (8/13/25 Tr. 207:12–208:12)

Attorney Heimowitz's expert opinion relied on his review of the depositions of Mr. Gupta, Mr. Jalbert, and Sandro Squatrito, Mr. Jalbert's Expert Report, and over 60 other documents, as well as a conversation he had with Mr. Gupta. (Exh. P92, Appx. B to Heimowitz Expert Report) Based on his review of those materials, Attorney Heimowitz disingenuously concluded that "CPI had sufficient information, and good reasons, to give informed consent to the" waiver contained in the Novo/CPI Engagement Contract. (Exh. P91, p. 35) Attorney Heimowitz further dismissively opined that "Novo and Mr. Gupta were permitted to accept the [Novo/]CPI [E]ngagement under applicable ethical guidelines and fiduciary doctrines" after reviewing, in conclusory fashion, the ethical guidelines and doctrines Mr. Jalbert cited in his own Expert Report. (*Id.*, 26–27) Therein, Attorney Heimowitz contends that the various ethical guidelines and doctrines cited by Mr. Jalbert are simply aspirational, inapplicable, or met by Novo in the CPI/Novo Engagement. (*Id.*) Attorney Heimowitz, again disingenuously, asserted, despite the facts and circumstances of Novo's work for BMO, that "[n]either Novo nor Mr. Gupta were adverse to CPI at the time of the [Novo/]CPI [E]ngagement," which, Attorney Heimowitz contended, "was not concurrent with the BMO[/Novo] [E]ngagement." (*Id.*, 33)

39

Underlying Attorney Heimowitz's conclusion that Novo and Mr. Gupta were permitted to accept the Novo/CPI Engagement under applicable ethical guidelines is his opinion that the ethical standards cited by Mr. Jalbert are mere frameworks rather than required, dispositive standards. (*Id.*, 26–27) He acknowledges that Mr. Jalbert's Expert Report "refers to ethical rules and guidelines concerning conflicts of interest," but concludes that those rules and guidelines "are not applicable to financial restructuring advisory firms or corporate fiduciaries" and thus did not bar Novo nor Mr. Gupta from accepting the Engagement. (*Id.*, 28) Relying instead on the anemic conflict waiver contained in the Novo/CPI Engagement Contract and Attorney Henzy's extensive warnings to CPI regarding the potential conflict of interest, Attorney Heimowitz concludes CPI's management simply made an informed business decision to engage Novo despite the known risks. (*Id.*, 26–32, 35) In their stark denial of ethical or fiduciary tensions, the Court does not credit these opinions and conclusions as meritorious.

At the close of Old CPI's case-in-chief, Novo moved for a directed verdict on all counts. (8/13/25 Tr. 107:24–133:19) The Court granted the motion as to Count One, in which Old CPI alleged, pursuant to 11 U.S.C. § 547, that the Pre-Petition BMO Payment[39] was an avoidable preference transfer as to Novo. (*Id.*) The Court issued a Memorandum of Decision Granting Judgment on Partial Findings as to Count One on September 17, 2025. (ECF No. 120), relying principally upon the fact

---

[39] Recall that the Pre-Petition BMO Payment refers to the sum that CPI paid to BMO on January 28, 2021, related to expenses BMO incurred in hiring Novo to assess CPI and Suri. (Stip. ¶ 22–23) The sum was transferred to BMO in two separate payments, which together totaled $273,616.25. (*Id.*, ¶ 23)

that the Transfer was owed and properly paid to BMO as the initial transferee. The Court declined to grant the Motion as to the other six counts of the Complaint and accordingly will address them herein.

After trial, the parties submitted Post-Trial Findings of Fact and Conclusions of Law.[40] Old CPI filed a Response (ECF No. 127) to Novo's Post-Trial Findings of Fact and Conclusions of Law, to which Novo filed a Rebuttal. (ECF No. 128) Thereafter, the Court took all of these matters under advisement.

### 3.  Conclusions of Law[41]

### 3.1 Jurisdiction

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. The fraudulent transfer claims brought are core claims under 28 U.S.C. § 157(b)(2)(H), but may be *Stern* claims.[42] The remaining claims are non-core claims, as they set forth claims for relief under common law and statutes of the State of Connecticut and are "related to" claims. The parties have expressly or impliedly consented to this Court's jurisdiction over all the claims brought. (ECF No. 1, p. 22; ECF No. 58)

---

[40] Old CPI's Post-Trial Brief (ECF No. 127) will be cited as "Plntff. Post-Trial Brief." Novo's Post-Trial Brief (ECF No. 128) will be cited as "Def. Post-Trial Brief."
[41] Additional material facts found by this Court are addressed herein.
[42] *See Stern v. Marshall*, 564 U.S. 462 (2011).

41

Each of the parties has admitted to the jurisdiction of this Court and CPI has waived its prior claim to a jury trial. (Stipulation with Withdrawal of Jury Demand and Stipulation to Proceed as Non-Jury Trial (ECF No. 61); Order Approving Stipulation (ECF No. 63))

### 3.2 Discussion

#### a. Count Two: Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551

In Count Two, Old CPI alleges that it is entitled pursuant to 11 U.S.C. § 548(a)(1)(B) to avoid against Novo the Pre-Petition BMO Payment – again, the $273,616.25 payment that CPI made to BMO on January 28, 2021. Specifically, Old CPI alleges that 11 U.S.C. § 548(a)(1)(B) applies because the transfer of funds was made on or within two (2) years of the Petition Date and while the Debtor was insolvent, and because the Debtor did not receive reasonably equivalent value in exchange for the Payment. To prevail on this claim, Old CPI alleges that Novo "was the initial transferee of the transfer(s) or the immediate or mediate transferee of such initial transferee or the person for whose benefit [the Pre-Petition BMO Payment was] made." (ECF No. 1, p. 15)

In response, Novo argues that the Debtor did receive reasonably equivalent value in exchange for the Pre-Petition BMO Payment, as CPI reaffirmed its obligation to reimburse BMO for the expenses it incurred in hiring Novo in exchange in part for BMO's assent to enter into and fund the Eighth Forbearance Agreement. (Def. Post-Trial Brief, p. 21)

42

As already concluded in the Court's Memorandum of Decision Granting Judgment on Partial Findings as to Count One, here "the evidence demonstrates that BMO clearly constitutes the initial transferee under 11 U.S.C. § 550 rather than a mere conduit." (ECF No. 120, p. 10) "BMO enjoyed an absolute legal entitlement, as the Debtor's obligee, to the transferred funds pursuant to the loan documents and the Eighth Forbearance Agreement." (*Id.*) Consequently, while BMO was the initial transferee, Novo at best might constitute an immediate or mediate transferee of the initial transfer under 11 U.S.C. § 550. Because BMO had a separate contractual obligation to pay Novo pursuant to the BMO/Novo Retention Agreement, however, this subsequent transfer is more accurately characterized as a distinct and separate transaction. Regardless, the transfer at issue here is strictly the Pre-Petition BMO Payment from CPI to BMO and, accordingly, therefore, the analysis hinges on whether CPI received reasonably equivalent value from Novo or BMO in exchange for the Payment.

"Outside of the foreclosure context, the term 'reasonably equivalent value' will 'ordinarily [have] a meaning similar to fair market value.'" *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 545 (1994). "To determine whether reasonably equivalent value was provided, 'the Court must ultimately examine the totality of the circumstances, including the armslength nature of the transaction; and the good faith of the transferee.'" *In re Wade Park Land Holdings, LLC*, 2024 WL 3024648 at *4 (2d Cir. 2024) (citing *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 172

43

(2d Cir. 2021) and *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 334 (Bankr. S.D.N.Y. 2011)).

Accordingly, while forbearance of foreclosure on BMO's defaulted loan may constitute reasonably equivalent value in the Second Circuit, this Court must assess the totality of the circumstances to determine whether BMO's forbearance on its defaulted loan here indeed *did* constitute reasonably equivalent value.

Having reviewed the totality of the facts and circumstances of CPI's pre-petition defaults and distress, the Court concludes that CPI did receive reasonably equivalent value in exchange for the Pre-Petition BMO Payment. By January 5, 2021, when the Senior Lenders and Debtors entered into the Eighth Forbearance Agreement, the Senior Lenders had "agreed to make Loans and other financial accommodations to [CPI] in an aggregate amount of up to $62,000,000, comprising of a $15,000,000 Revolving Facility, a $28,000,000 Equipment Facility, and a $19,000,000 Construction Facility." (Exh. P19, p. 1; Stip. ¶ 36) Pursuant to that Agreement, BMO "agree[d] to forbear from exercising [its] rights and remedies against [CPI] under the Loan Documents with respect to the Existing Defaults" for a period of time. (*Id.*, 4) In return, among other things, CPI reaffirmed that BMO had the right to hire a third party to conduct a financial assessment of CPI to enforce its rights under the Third Credit Agreement, and the right to be reimbursed for any expenses it incurred in exercising that right. (*Id.*, 15) BMO had expended $273,616.25 to hire Novo to conduct a financial assessment of CPI in the summer of

44

2020, and CPI accordingly reimbursed BMO for that expense, as promised, via the Pre-Petition BMO Payment less than three weeks later.[43]

BMO's assent to the Eighth Forbearance Agreement was of material and substantial value to CPI, as it allowed CPI to continue operating. Had BMO not agreed to forbear from exercising its rights and remedies against CPI, CPI might then have been liquidated. (8/14/25 Tr. 46: 8–11) Attorney Heimowitz, when asked why CPI entered into the Eighth Forbearance Agreement, opined that CPI "would have likely liquidated if they hadn't agreed to a forbearance agreement." (*Id.*, 45:24–46:17) Attorney Heimowitz further testified that, generally, when a lender doesn't "agree with the borrower as to what to do, [an officer or director of the borrower is] basically setting the company up . . . for a freefall bankruptcy or an absolute disaster." (*Id.*, 46:2–7) Even Mr. Jalbert, when testifying on behalf of Old CPI as Liquidating Custodian, acknowledged that he indeed believes "that the [E]ighth [F]orbearance [A]greement was beneficial to CPI . . . ." (8/12/25 Tr. 167:20–168:3)

Thus, having reviewed the aforesaid totality of the facts and circumstances, the Court concludes that CPI received reasonably equivalent value from BMO through the Eighth Forbearance Agreement to the value CPI transferred in making the Pre-Petition BMO Payment. Accordingly, the Court concludes that this transfer

---

[43] It is of no matter that BMO had already incurred the cost of hiring Novo, as CPI expressly promised in § 13.14 of the Eighth Forbearance Agreement to reimburse BMO for "all reasonable costs, fees, and expenses" incurred "in connection with the negotiation, *preparation*, administration, and enforcement of this Agreement" and further expressly "reaffirm[ed] its agreement under the applicable Loan Documents to pay or reimburse . . . Lenders for certain costs and expenses incurred by . . . Lenders in connection with the Loans." Exh. D43, p. 15, § 13.14.

45

cannot be avoided under 11 U.S.C. § 548(a)(1)(B). The fact that BMO then paid Novo, a third party to which it was independently legally obligated, and perhaps even an immediate transferee under 11 U.S.C. § 550, is of no matter. It does not impact or alter the Court's analysis because Old CPI has not met its burden to establish that a fraudulent transfer occurred in the first instance.

### b. Count Three: Constructive Fraudulent Transfer pursuant to the Connecticut Uniform Fraudulent Transfer Act (CUFTA), Conn. Gen. Stat. §§ 52-552e(a)(2) and 52-552f(a)

In Count Three, Old CPI alleges that it is entitled pursuant to CUFTA, Conn. Gen. Stat. §§ 52-552e(a)(2) and 52-552f(a), to avoid the Pre-Petition BMO Payment as the Payment was made on or within four years of the Petition Date and while the Debtor was insolvent, and the Debtor did not receive reasonably equivalent value in exchange for the Payment.

For the same reasons stated in Part 3.2(a) above, the Court concludes and adjudges that (1) Old CPI has not met its burden to establish that a fraudulent transfer occurred in the first instance, and (2) the Debtor did receive reasonably equivalent value from BMO in exchange for the Pre-Petition BMO Payment. Accordingly, CPI cannot prevail on this Count.

### c. Count Four: Breach of Fiduciary Duty as to the Pre-Petition BMO Payment

In Count Four, Old CPI alleges that Novo owed fiduciary duties to CPI as its CRO and financial advisor because Novo "undertook a duty to act on behalf of CPI for its benefit with respect to the most critical functions of its business and to take steps to ensure its financial survival," and "[t]hus, a fiduciary relationship was

46

created." (Plntff. Post-Trial Brief, p. 30) CPI alleges that Novo breached those fiduciary duties "by causing CPI to borrow funds from its Lenders, thereby increasing its indebtedness to such Lenders at a time when CPI was already in default of its Pre-Petition Obligations and was unable to pay critical trade vendors and creditors," to enable CPI to make the Payment. (ECF No. 1, p. 17)

In response, Novo asserts that there is no evidence that Novo or Mr. Gupta breached any fiduciary duties owed by causing CPI to borrow the funds that enabled it to make the Payment to BMO because CPI was contractually obligated to make the Payment and received reasonably equivalent value from vendors and creditors for the Payment. (Def. Post-Trial Brief, p. 21–22)

In Connecticut, "[w]hether a fiduciary duty exists in any particular case, and the nature of that duty, is context dependent and 'fact driven . . . .'" *Barash v. Lembo,* 348 Conn. 264, 297, 303 A.3d 577, 598 (2023) (citing *Iacurci v. Sax,* 313 Conn. 786, 795, 99 A.3d 1145, 1151 (2014)). A breach of fiduciary duty claim requires: (1) the existence of a fiduciary relationship, giving rise to a duty, (2) breach of that duty, (3) causation, and (4) damages. *Id.*, 302–03.

"[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Sherwood v. Danbury Hosp.*, 278 Conn. 163, 195, 896 A.2d 777, 796 (2006) (quoting *Biller Assocs. v. Peterken*, 269 Conn. 716, 723, 849 A.2d 847, 851 (2004)). "[T]he law will imply [fiduciary responsibilities] only where one party to a relationship is

unable to fully protect its interests [or where one party has a high degree of control over the property . . . of another] and the unprotected party has placed its trust and confidence in the other." *Mangiante v. Niemiec*, 82 Conn. App. 277, 282, 834 A.2d 656, 659 (2004) (citing *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38, 761 A.2d 1268, 1280 (2000)). "The defining characteristic of a fiduciary relationship is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor. A fiduciary relationship allows the trusting party, the principal, to relax the care and vigilance ordinarily exercised." 2A C.J.S. Agency § 262. However, "[t]he superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." *Sherwood, supra*, 278 Conn. at 195, 896 A.2d at 796–97 (quoting *Cadle Co. v. D'Addario*, 268 Conn. 441, 455, 844 A.2d 836, 847 (2004)).

Connecticut law has not "defined [the fiduciary] relationship 'in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.' . . . The relationship between sophisticated partners in a business venture may differ from the relationship involving lay people who are wholly dependent upon the expertise of a fiduciary. Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians." *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 108–09, 912 A.2d

1019, 1034–35 (2007) (quoting *Konover Dev. Corp. v. Zeller,* 228 Conn. 206, 222–23, 635 A.2d 798, 806 (1994)). Likewise, "[E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations." *Id.* at 109.

"The fiduciary relation demands something more than the morals of the market place." *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 282, 5 A.2d 503, 515 (1939). A fiduciary "must act honestly, and with the finest and undivided loyalty . . . , not merely with that standard of honor required of men dealing at arm's length and the workaday world, but with a punctilio of honor the most sensitive." *Zeller, supra*, 228 Conn. at 220, 635 A.2d at 805 (quoting Chief Judge Benjamin Cardozo in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)). *See also Pacelli Bros. Transp., Inc. v. Pacelli*, 189 Conn. 401, 407, 456 A.2d 325, 329 (1983) ("[A fiduciary] occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation."); 3 Am. Jur. 2d Agency § 163 (noting that a fiduciary must "act solely for the benefit of the principal, and in the utmost good faith for the benefit and in the best interest of the principal in the course of the fiduciary relationship.").

When one serves as a fiduciary for another party, the fiduciary owes a duty of loyalty to that party. *Barash, supra*, 348 Conn. at 298, 303 A.3d at 598. The fiduciary must act in the best interests of that party and in good faith in any matter relating to that party. *Id.* "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent

49

shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Wall Sys., Inc. v. Pompa*, 324 Conn. 718, 730 n.9, 154 A.3d 989, 998 n.9 (2017). "The duty of loyalty means [the] agent is prohibited from acting in any manner inconsistent with their agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of duties." 2A C.J.S. Agency § 266. "The relationship of principal and agent implies trust or confidence by the principal in the agent, and the agent is obligated to exercise the utmost good faith, loyalty and honesty toward his principal . . . . The general principle for the agent's duty of loyalty according to the Restatement is that the agent must act solely for the benefit of the principal in matters connected with the agency." *Pompa, supra*, 324 Conn. at 731, 154 A.3d at 998. "The duty of loyalty is the most important fiduciary duty of corporate officers and directors." Joel Seligman, *The New Corporate Law*, 59 BROOK. L. REV. 1, 3 (1993). A CRO and financial advisor's control and authority is tantamount to that of corporate officers and directors.

Appurtenant to the duty of loyalty, in Connecticut, "[i]t is a thoroughly well-settled equitable rule that any one acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest. This rule is strict in its requirements and in its operation," and "extends to all transactions where the individual's personal interests may be brought into conflict with his acts in the fiduciary capacity, and it works independently of the question whether there was fraud or whether there was good intention." *Murphy v. Wakelee*,

247 Conn. 396, 401–02, 721 A.2d 1181, 1184 (1998) (quoting *State v. Culhane*, 78 Conn. 622, 622, 63 A. 636, 638 (1906)). *See also Mallory v. Mallory Wheeler Co.*, 61 Conn. 131, 137–38, 23 A. 708, 710 (1891) ("The underlying thought is that an agent or other fiduciary should not unite his personal and his representative characters in the same transaction; and equity will not permit him to be exposed to the temptation, or be brought into a situation where his own personal interests conflict with the interests of his principal and with the duties he owes to his principal. The rule applies alike to agents, partners, guardians, executors, and administrators, and directors and managing officers of corporations, as well as to technical trustees."); 3 Am. Jur. 2d Agency § 163 ("The agent owes the principal undivided allegiance and must refrain from obtaining any advantage at the principal's expense, [and must not] voluntarily take a position or permit being placed in a position of interests in conflict with the principal's interest, or doing any harmful act to the principal, and must refrain from any act of self-dealing not authorized."). Accordingly, the duty of loyalty prevents a fiduciary from furthering personal interests through the fiduciary relationship and from partaking in an engagement that would conflict with the duties owed to the principal.

One serving as a fiduciary also owes a duty of disclosure. As the Connecticut Supreme Court stated, "It is essential to the validity of a contract between a fiduciary and a beneficiary concerning matters within the scope of that relationship that a full disclosure be made of all relevant facts which the fiduciary knows or should know. . . . We are not inclined to relax these high standards which the law

51

demands of fiduciaries." *Pacelli Bros. Transp., Inc. v. Pacelli*, 189 Conn. 401, 408–09, 456 A.2d 325, 329 (1983). *See also Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 314, 94 A.3d 553, 571 (2014) (concluding that an attorney serving as a fiduciary breached the duty of loyalty owed to his client when he failed to disclose material facts); 3 Am. Jur. 2d Agency § 163 ("Agents have a legal duty to the principal to disclose information obtained in the course of the agency and material to the subject matter of the agency, *making full disclosure to the principal of any conflicts of interest. The agent's duty is one of full disclosure of matters concerning the parties' interests under a strict duty of candor and good faith.*") (emphasis added). Furthermore, "An agent's obligation to disclose to the principal any information concerning the agency which the principal would be likely to want to know is strongest when the principal has a conflicting interest in the transaction connected with the agency." 2A C.J.S. Agency § 269.

Regarding delegation, generally "a fiduciary cannot delegate [their] authority because the duty of a fiduciary is personal and cannot be divested by delegation." Executor or Administrator's Ability to Delegate Fiduciary Authority, Settlement of Estates in Conn. § 7:41 (3d ed.). *See also* Restatement (First) of Agency § 18 (1933) ("Unless the principal manifests otherwise, an agent has no authority to delegate to another the exercise of discretion in the performance of his authority; nor may a servant delegate to another the performance of service."). Nonetheless, where a fiduciary does delegate certain tasks, "those to whom the authority was delegated [are likewise] obligated to adhere to those fiduciary duties . . . ." *Bohn v. Dorothea L.*

*Denton, LLC,* No. DBD-CV-186024779S, 2021 WL 4286568, at *25 (Conn. Super. Ct. Sept. 3, 2021). *See also* Restatement (Second) of Agency § 428 (1958). Furthermore, "Courts have consistently held that a delegating fiduciary has an obligation to monitor its appointed fiduciary's performance with respect to any fiduciary duty delegated to the appointed fiduciary." T. David Cowart, et al., *The Duty to Monitor: A Fiduciary's Continuing Responsibility,* VMD0529 AM. L. INST. – A.B.A. CONTINUING LEGAL ED. 229, 232 (2003).

### i.      Burden of Proof

"Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary." *Sherwood v. Danbury Hosp.*, *supra*, 278 Conn. at 196, 896 A.2d at 797 (quoting *Cadle Co.*, *supra*, 268 Conn. at 455, 844 A.2d at 847). Thus, if Novo is found to have served as CPI's fiduciary, Novo must prove that it dealt fairly with CPI by clear and convincing evidence. *See Murphy*, *supra*, 247 Conn. at 400, 721 A.2d at 1184 ("Proof of a fiduciary relationship, therefore, generally imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the standard of proof is clear and convincing evidence. Although we have not *expressly* limited the application of these traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases where we have invoked them have involved such deviations.") (emphasis in original); *Dunham v. Dunham*, 204 Conn. 303, 322–23, 528 A.2d 1123, 1134 (1987).

53

### ii.      Existence of a Fiduciary Relationship

Here, the Court concludes that both Mr. Gupta and Novo owed a fiduciary duty to CPI, given the critical role they played in guiding CPI at a time when both CPI and its principals were particularly vulnerable and facing the harsh and unfamiliar world of financial distress.

When CPI hired Novo and Mr. Gupta on August 7, 2020, the Novo/CPI Engagement Contract stated that Mr. Gupta would serve as CPI's CRO,[44] with other Novo personnel to serve as temporary employees of CPI. (Exh. P4, p. 1) As noted, the Contract expressly granted Mr. Gupta authority to become an officer of CPI, to exercise "his business judgment" on CPI's behalf, "to hire and terminate employment that leads to improved and sustained business performance," and to "[d]evelop a long-term business plan and strategy for the Company." (*Id.*; 8/11/25 Tr. 56:21–57:4) Mr. Gupta enjoyed great authority over CPI and he even acknowledged that reality at trial and that he accordingly owed a "duty of loyalty" and care to CPI, which required him "to put [CPI's] interests above all others . . . ." (8/11/25 Tr. 60:14–25) Novo similarly agreed to "[m]ake personnel changes and adjustments based on [its] business judgment to improve . . . operating costs," "[w]ork closely with the sales organization to develop [CPI's] sales pipeline," and "[p]erform an assessment of the outstanding accounts payable, identify all critical vendors, and develop payment plans for continued support of [CPI]." (Exh. P4, p. 2) Novo, too, therefore exercised great control over CPI, implementing its business

---

[44] See footnote 6 of this Memorandum of Decision, detailing the role of a CRO.

54

judgment and expertise to help improve CPI's finances at a critical time. Accordingly, the Court concludes that both Mr. Gupta and Novo assumed significant dominion, influence, and control over CPI's operations, business decisions, and property during its financial distress to navigate restructuring waters both in and outside of Chapter 11, such that Mr. Gupta and Novo indisputably became CPI's fiduciaries. Novo's contrary assertions and thin efforts to distinguish Mr. Gupta from Novo in this context are manifestly dishonest.

Bolstering this conclusion is the fact that Novo not only agreed to take on critical tasks and assume authority over multiple aspects of CPI's operations and its reorganization strategy, but also that Novo did so at a time when CPI's management was without the focus, skills, or experience to do so. Mrs. Squatrito was pulled away from CPI because she had to direct her attention to her sick and dying husband. (8/12/25 Tr. 13:2–5; 8/13/25 Tr. 151:14–18) Sandro and Sergio helped manage the day-to-day operations, but were unable to fully embrace those roles due to their rocky interpersonal relationship. (8/12/25 Tr. 13:6–17) Further, CPI unexpectedly lost a major portion of its revenues while embarking on a costly plant expansion – events that required more of CPI's attention, not less. (8/11/25 Tr. 187:11–14; 8/13/25 Tr. 157:5–10) As the company navigated this period of crushing financial distress and its principals experienced a period of distraction, tumult, and misfortune, the Court concludes that Novo and Mr. Gupta incontrovertibly stepped into a superior position over CPI and that they possessed superior knowledge, skill, and expertise to CPI. Recall that Novo specialized in restructuring and that CPI, a

55

family business, had no meaningful experience in restructuring. Accordingly, under these facts, the Court concludes that a fiduciary relationship existed and that Novo and Mr. Gupta were duty bound to appropriately represent CPI's interests as its fiduciaries. Novo, CPI's sole counterparty in the Novo/CPI Engagement Contract, thus bears the burden, by clear and convincing evidence, to prove fair dealing as to the Novo Transfers.

### iii.   Breach of Fiduciary Duties as to the Pre-Petition BMO Payment

As the Court has previously found, "BMO enjoyed an absolute legal entitlement, as the Debtor's obligee, to the transferred funds pursuant to the loan documents and the Eighth Forbearance Agreement." (ECF No. 120, p. 10 (Memorandum of Decision Granting Judgment on Partial Findings as to Count One); Parts 3.2.a and 3.2.b of this Memorandum of Decision) CPI was obligated to transfer the funds to BMO, even if it meant increasing its indebtedness.[45] Old CPI has not demonstrated how any role that Novo may have played in ensuring that CPI made the Pre-Petition BMO Payment, which CPI clearly owed to BMO, constitutes a violation of the fiduciary duties that Novo owed CPI, or a failure of Novo to act in the best interests of CPI and in good faith in this matter. CPI had full disclosure about the Payment and why it was being sent and immensely benefited from BMO's forbearance and its additional advances.

---

[45] Indeed, if CPI failed to pay these sums, those expenses, related to Novo's services to BMO, would naturally have become part of CPI's loan indebtedness to BMO.

56

Old CPI, as in Count One, again points to "1) the closeness in time of the Pre-Petition BMO Payment and the subsequent payment from BMO to Novo; 2) the equivalence of the Pre-Petition BMO Payment and the subsequent payment from BMO to Novo; 3) the inclusion of a $273,616.25 payment entry to Novo on CPI's Accounts Payable Aging Spreadsheet; and 4) the supervision and facilitation of the payments from CPI to BMO to Novo by Novo's employee," Mr. Piotrowski, as indicating that Novo breached its fiduciary duties in ensuring the Pre-Petition BMO Payment was made. (Memorandum of Decision Granting Judgment on Partial Findings as to Count One, ECF No. 120, p. 10; 8/13/25 Tr. 114:20–119:13 (wherein Old CPI makes these arguments))

As fully discussed in this Court's decision on Count One, these facts are not dispositive. (*Id.*) Particularly, the fact that BMO subsequently transferred an identical sum to Novo does not alter the Court's analysis or somehow indicate a lack of fair dealing on Novo's part. On the contrary, it was commonsensical for BMO to pay Novo once it received the correlated funds from CPI. Accordingly, the Court concludes and adjudges that Novo, by clear and convincing evidence, did not breach any fiduciary duty as it pertains to the Pre-Petition BMO Payment.

### d. Count Five: Breach of Fiduciary Duty as to the Novo/CPI Engagement

In Count Five, Old CPI reiterates that Novo owed fiduciary duties to CPI as its financial advisor and CRO (the role in which Mr. Gupta served), and that Novo breached those duties in a number of ways.

First, Old CPI asserts that "Novo's conflict of interest, due to its prior and ongoing relationship with BMO . . . impaired and/or prevented Novo from fulfilling its fiduciary duties to CPI and exercising loyalty to CPI and its independent business judgment for the exclusive benefit of CPI and free from any restraint or influence by its own pecuniary interests . . . ." (ECF No. 1, p. 18)

Second, Old CPI asserts that "[d]espite [its] patent conflict of interest, as CRO of CPI, Novo caused CPI to pay Novo [compensation for its role as CRO] in the sum of $1,167,036 for CRO services rendered during the period August 7, 2020 through the Petition Date – a period of only approximately 6 months – and at a time when CPI could not timely and fully pay [all of its] critical trade vendors and creditors . . . ." (*Id.*)

Third, Old CPI contends that "Novo caused CPI to borrow funds and increase its indebtedness on the eve of its bankruptcy filing for the sole purpose of CPI's payment of Novo's outstanding invoices associated with the BMO/Novo Engagement . . . ."(*Id.*)

Fourth and finally, Old CPI contends that "Novo paid itself the CRO Payments while being unable to act solely for the best interest CPI and/or free from any conflict of interest." (*Id.*)

In response, Novo reasserts that while Mr. Gupta owed a fiduciary duty to CPI, Novo did not owe CPI any such duties, and that, regardless, neither Mr. Gupta nor Novo breached any fiduciary duty owed. Further, Novo contends that "CPI waived any such conflict [of interest] in its independent business judgment with the

58

advice of counsel" by signing the Novo/CPI Engagement Contract. (Def. Post-Trial Brief, p. 26 (ECF No. 126)) Specifically, Novo asserts that "M[r]s. Squatrito, on behalf of CPI, intended to waive Novo's potential conflict of interest in the CPI Engagement." (*Id.*)

This Court, in ruling on Count Five, relies on and incorporates the law addressed and findings found in ruling on Count Four in Part 3.2.c of this Memorandum of Decision. As previously stated in Part 3.2.c of this Memorandum of Decision, the Court concludes and adjudges that both Novo and Mr. Gupta indisputably acted as CPI's fiduciaries. Therefore, it is Novo who bears the burden to prove by clear and convincing evidence its fair dealing throughout the Novo/CPI Engagement.

### i.    Novo's Conflict of Interest

The Court concludes and adjudges that there was a clear and unmistakable conflict of interest that should have prevented Novo from entering into the Novo/CPI Engagement Contract on August 7, 2020, given that Novo had previously been retained by BMO to assess CPI's viability and that Novo had an ongoing "institutional relationship" with BMO. (MC – ECF No. 123-2, p. 5) As discussed in Part 2 of this Memorandum of Decision, BMO hired Novo to assess CPI and Suri's viability and perform a Liquidation Analysis of CPI in the summer of 2020. Accordingly, Novo thereby evaluated BMO's interests, which were to reduce its losses and minimize its exposure associated with the CPI loans. Novo visited CPI, assessed CPI on BMO's behalf, developed and advised on the Lender Report

59

containing the Liquidation Analysis, and summarized and discussed its findings with the Senior Lenders. Novo also appears to have been tasked with setting forth BMO's strategic options going forward regarding CPI. Novo agreed to keep this advisory work for the Senior Lenders strictly confidential. Neither this Court nor CPI know the full extent and tenor of Novo's confidential advice and conclusions to the Senior Lenders.

On August 6, 2020, the BMO/Novo Engagement seemingly concluded. The very next day, Novo agreed to serve as CPI's financial advisor with Mr. Gupta serving as its CRO. Thereby, both Mr. Gupta and Novo agreed to provide extensive financial advisory services and exert significant dominion, control, and influence over CPI's operations and strategic approach to a potential restructuring. As Mr. Gupta even testified at trial, he became an officer of CPI, fully entrusted "with specific authority to take actions on behalf of [CPI]." (8/11/25 Tr. 56:21–57:4) The Novo/CPI Engagement Contract permitted Novo to "fully, independently and directly communicate with [CPI's] senior secured lenders [including BMO] and their professionals and advisors from time to time in performing the Services hereunder and will share such communications with the Board of Directors as described in the Scope of Services." (Exh. P4, p. 4) Mr. Gupta indeed regularly communicated with representatives of BMO on CPI's behalf. (8/11/25 Tr. 195:12–14) Neither this Court nor CPI fully know the content and tenor of those confidential communications.

As mentioned, Mrs. Squatrito and CPI's prior leadership adamantly did not want to liquidate. (8/12/25 Tr. 16:3–7) Instead, the Squatritos sought an alternative

that might allow the company to continue operating with the Squatrito family at the helm, as it had for over forty years.[46] (Id.; MC – ECF No. 4, p. 2) The stark contrast in objectives that Novo had to navigate – as it concluded its assessment of CPI on BMO's behalf one day and commenced its navigation on CPI's behalf the next – underscores that CPI and BMO actually or potentially possessed diametrically opposing interests.[47] CPI and BMO's interests *aligned* only insofar as success for CPI in effecting a successful operational turnaround would have spelled success for BMO by preserving or enhancing the enterprise value and the attractiveness of CPI for an orderly liquidation sale. Their interests, however, also manifestly *diverged* economically, as CPI wanted to keep the family business running with the Squatritos at the helm, while BMO's focus embraced mitigating further advances or losses of enterprise value associated with its operating loans to CPI and Suri.[48]

Therefore, on August 7, 2020, Novo, having just represented and advised BMO the day before, and having performed a fulsome Liquidation Analysis, was installed to guide CPI's diametrically opposed goals and interests, including its

---

[46] As Attorney Henzy testified, the Squatritos wanted "to keep their business and to [continue to] run their business," not to liquidate. (8/12/25 Tr. 16:3–7)

[47] As Mr. Jalbert astutely opined at trial, once Novo "worked for Carla's Pasta, they were working from one day to the next day for and against two very adverse parties." (8/13/25 Tr. 20:6–8)

[48] This divergence in interests is not something that arose throughout the duration of the Novo/CPI Engagement. Perfectly encapsulating these diverging positions is the position CPI was in while Novo was being considered to become its new CRO and financial advisor in late July and early August of 2020. At this time, CPI needed more liquidity to stay operational (8/12/25 Tr. 28:19–29:1); which conflicted with BMO's goals to limit further advances and impose a new CRO and financial advisor on CPI who could help reduce BMO's exposure. (Exh. P1, p. 2; Exh. P19, p. 15; Exh. D14; 8/11/25 Tr. 38:14–39:16) As an experienced advisor well versed in CPI and BMO's relationship, Novo was fully aware of these dynamics and diverging interests before the Novo/CPI Engagement began.

interest in avoiding liquidation and motivating BMO to further fund operational needs.[49] All the while, Novo was to keep confidential its communications with the Senior Lenders and the information it had learned about CPI through its engagement with BMO and its development of the Liquidation Analysis contained within the Lender Report. This restraint presents a formidable, if not unsurpassable ethical impediment for a strategic restructuring professional and a fully aligned fiduciary advisor. For example, CPI asked Novo whether it could view the Lender Report on at least two separate occasions.[50] Citing the confidentiality provisions of the BMO/Novo Retention Agreement and BMO's lack of consent, Novo refused to share the Lender Report or the advice it gave to BMO with CPI. (8/11/25 Tr. 203:5–13) This scenario demonstrates Novo's conflicting duties to act as CPI's unbridled fiduciary while simultaneously honoring its commitments and the confidential opinions and advice it gave to BMO.

Furthermore, Novo was not only hired by BMO to assess CPI, but also maintained an ongoing continuing relationship with BMO as one of its approved financial advisors. Accordingly, Novo would be naturally incentivized to perform its

---

[49] In financial distress, a debtor would naturally expect operational guidance and strategic guidance to facilitate a restructuring, as opposed to any form of liquidation. Sometimes, that strategy must be adversarial. Whereas here, there were no personal guarantees of BMO's debt by the Squatrito family, some leverage to exact mutual objectives might be called for. (8/11/25 Tr. 69:22–70:1) There was no evidence presented to this Court that such a range of restructuring strategies were advised, assessed, or pursued under Novo's or Mr. Gupta's captaining of the course of action through CPI's distress, demonstrating the consequences that the conflict of interest created for CPI.

[50] 8/11/25 Tr. 61:24–63:10 (discussing that CPI asked to see the Lender Report before CPI retained Novo in August of 2020); 8/11/25 Tr. 203:5–13 (discussing that CPI asked to review the Lender Report prior to Novo's termination of the Novo/CPI Engagement in March of 2021); Exh. P25, p. 1 (again illustrating that CPI asked to read the Lender Report prior to Novo's termination of the Novo/CPI Engagement).

duties under its singular engagement with BMO in 2020, but also to endeavor to maintain a status that brought Novo future revenues and BMO's referral of distressed businesses. The Court acknowledges that Attorney Heimowitz opined that BMO's retention of Novo "was not concurrent" with CPI's retention of Novo, but given both the confidentiality provision Novo was subject to and the conflicting motivations it faced to loyally serve CPI while still maintaining its lucrative business relationship with BMO, the Court finds his conclusions to be disingenuous and unsupported by the evidence in the record. (Exh. P91, p. 35) Thus, the conflict of interest that the Novo/CPI Engagement created for Novo was or should have been extraordinarily obvious, profoundly troubling, and recognized, in advance, as irreconcilable.[51]

In sum, under these facts and circumstances, the Court concludes and adjudges that Novo faced a clear, manifest, and actual or potential conflict of interest in accepting the Novo/CPI Engagement.[52]

---

[51] Recall that both Attorney Henzy and counsel for PUB both accurately foresaw that Novo could not be retained by CPI in a Chapter 11 bankruptcy. (8/12/25 Tr. 35:3–19; Exh. D19, p. 1; Exh. P83, p. 1)

[52] Novo attempts to counter this conclusion by illustrating its successes in its engagement with CPI. For example, in its Post-Trial Brief, Novo asserts that it "was able to begin implementing performance improvement initiatives more quickly than another CRO" because Novo was able to take "advantage of the insights from Novo's work on the [BMO/Novo Engagement] to further vet and implement certain performance improvement initiatives." (Def. Post-Trial Brief, p. 12) To that end, Novo further cites Sandro Squatrito's statement that he believes Novo ran CPI "well" and fostered "much more open dialogue throughout the facility, from the hourly staff through to Carla." (*Id.*, 13; Exh. D86 at 27:7–18)

Although the Novo/CPI Engagement may have indeed provided value to CPI and operational improvements may have resulted, these outcomes do not negate the Court's conclusion that the Novo/CPI Engagement was fraught with a serious, debilitating conflict of interest.

63

### ii.   Novo's Efforts to Secure a Knowing Waiver Were Fundamentally Inadequate

Novo argues that even if it did owe fiduciary duties of loyalty and disclosure to CPI, and even if a conflict existed that would normally have breached Novo's duty of loyalty, CPI waived its right to complain about breaches of those fiduciary duties as it pertained to Novo's relationship with BMO by signing the Novo/CPI Engagement Contract. The Novo/CPI Engagement Contract stated:

> Notwithstanding anything set forth in this section or any other sections or provisions of this Engagement Contract, Novo and [CPI] agree and acknowledge that Novo may fully, independently, and directly communicate with [CPI's] senior secured lenders and will share such communications with the Board of Directors as described in the Scope of Services. [CPI] acknowledges that Novo previously represented the senior secured lender(s) (Bank of Montreal and People's United Bank) of CPI, and *agrees to waive all previous conflicts related to the prior lender engagement between Novo and the lender(s).*

(Exh. P4, p. 3, emphasis added)

Novo asserts that this blanket language sufficiently informed CPI about Novo's relationship with BMO and that, by signing the Engagement Contract, CPI waived any conflict that may have arisen due to Novo's and Mr. Gupta's relationship with BMO. The Court firmly disagrees and concludes that such a contention is self-serving and, again, specious as to the adequacy of the purported waiver because it is bereft of any of the material disclosures that a genuine fiduciary should make to assure the due performance of its duties and to secure a knowing and intelligent waiver of conflicts.

The Court further disagrees with Novo's distorted contentions primarily because the waiver specifically refers only to *previous conflicts* related to the *prior*

64

*lender engagement* between BMO and Novo, but BMO's relationship with Novo did not end on August 6, 2020. First, Novo was naturally incentivized to stay in BMO's good graces and maintain the ongoing "institutional relationship" it enjoyed with BMO and benefited from, while simultaneously representing CPI's interests in efforts to secure cooperation and funding from BMO. (MC – ECF No. 123-2, p. 5) Confirming this incentive is the fact that no evidence was adduced at trial indicating that Novo's relationship with BMO had concluded. Second, although Novo was no longer retained by BMO on the CPI matter after August 6, 2020, Novo was still required to protect the confidential Lender Report it authored and advised on during the BMO/Novo Engagement. (Exh. P1, p. 7; 8/13/25 Tr. 176:9–16; 8/14/25 Tr. 99:11–17) The inside information Novo garnered about CPI included its customers, vendors, business, management capabilities, liquidity, its range of financial needs, its operational vulnerabilities, and its management's interpersonal vulnerabilities. Novo nevertheless could not share the Lender Report with CPI.[53]

---

[53] Novo's Expert Witness, Attorney Heimowitz, opined that, although Novo did not share the Lender Report with CPI, it did essentially share the substance of that info with CPI. He writes in his Expert Report: "CPI was not deprived of the substance of the Lender Report because Mr. Gupta was in possession of the information contained in the Lender Report and as CRO was able to act on CPI's behalf with that knowledge. Mr. Gupta testified that as CRO he acted 'in line with the conclusions' in the Lender Report, and further that additional measures were identified and implemented to improve CPI's value as a going concern." (Exh. D90, p. 21–22) Similarly, Attorney Heimowitz stated at trial that CPI "had the [L]ender [R]eport essentially" because Mr. Gupta would have remembered the contents of the Report and "when he took over as CRO [he] could have done any of these things without violating any confidentiality." (8/13/25 Tr. 230:1–15) He continued: "There's nothing that restricted [Mr. Gupta] from [implementing] any of these company performance improvement initiatives." (*Id.*)

Conversely, Attorney Heimowitz was asked during trial: "Mr. Gupta wasn't allowed to reveal the contents of the [Lender Report] to [CPI], correct?" (8/14/25 Tr. 99:11–12) Attorney Heimowitz replied: "The specific contents, yes." (*Id.*, 99:13) And indeed, BMO did not allow Novo to share the contents of the Lender Report with CPI. (8/11/25 Tr. 203:5–13)

The parties dispute the significance of Mr. Gupta's intimate knowledge of the Lender Report and his inability to share that information with CPI due to the confidentiality requirements of the BMO/Novo Retention Agreement, while he likely still relied on that knowledge in his work as CPI's

(8/11/25 Tr. 201:156–22, 203:5–13) Accordingly, the misleading description of Novo's conflict with BMO as a "previous conflict" did not meaningfully acknowledge or explain Novo's ongoing relationship with and duties owed to BMO, or its prior vision for CPI's liquidation, or its assessment of CPI's reorganization prospects. Thus, the Court concludes that the waiver contained in the Novo/CPI Engagement Contract was patently inadequate to secure CPI's knowing waiver of the conflict of interest that Novo's retention entailed.

Novo argues that even if the waiver was insufficient as written, CPI knew the full extent of BMO's relationship with Novo simply because CPI was repeatedly warned by Attorney Henzy about the risks inherent in hiring Novo, and thus that CPI fully waived any conflict that arose. For example, Attorney Henzy told CPI that "Novo does work for BMO frequently," (Exh. D13, p. 3); that Novo was "being brought in to liquidate CPI," (Exh. D20, p. 1; 8/12/25 Tr. 53:8–17); and that Novo could not be approved by a bankruptcy court to serve as CPI's CRO under applicable standards in the Second Circuit. (Exh. D. 19, p. 1–2; Exh. D13, p. 2)

Although this evidence illustrates that CPI was *aware* of Attorney Henzy's belief that hiring Novo may have posed a conflict of interest, it does not illustrate that CPI *fully understood* the substance or disabling nature of the ongoing conflict of interest, nor that Novo discharged its responsibilities to address those concerns

---

CRO. Regardless of whether Mr. Gupta used the specific information contained in the Lender Report as CPI's CRO, the fundamental and irreconcilable issue is that Novo and Mr. Gupta owed conflicting duties to both BMO and CPI, simultaneously, and further, were likely unable to serve CPI in a Chapter 11 as its CRO or financial advisor, despite their promises to do so. Novo and Mr. Gupta did not adequately apprise CPI of these issues.

66

with sufficient detail in advance. Although the Squatritos were informed that "Novo does work for BMO frequently," it is not clear from the evidence adduced at trial that they understood the dimensions of Novo's ongoing institutional relationship with BMO and that Novo remained obligated to hold confidential the conclusions and opinions (written or oral) that it had advanced about CPI to BMO. (Exh. D13, p. 3) The fact that CPI only later requested access to the Lender Report in fact indicates that CPI *did not* fully appreciate the conflict that existed and its consequences.[54] At trial, Novo adduced no evidence that its conflict disclosures were otherwise fulsome, forward-looking, or consistent with its independent fiduciary duties of adequate disclosure. (8/11/25 Tr. 132:5–12; 8/13/25 Tr. 145:20–146:12)

Second, Attorney Henzy's statements do not constitute an exonerating warning given to CPI *by Novo* about the conflict. In his Expert Report, Attorney Heimowitz makes much of the fact that Attorney Henzy warned CPI about the conflict, opining that CPI therefore made an informed business decision to hire Novo despite the risks. (Exh. D90, p. 29–32) Novo did not demonstrate, however, that it delegated the fiduciary duty of disclosure that it owed CPI to Attorney Henzy, nor that Novo could delegate such a duty. *See* Executor or Administrator's Ability to Delegate Fiduciary Authority, Settlement of Estates in Conn. § 7:41 (3d ed.); Restatement (First) of Agency § 18 (1933). Furthermore, Novo's attempts to

---

[54] In his deposition, Sandro Squatrito attested that he "did not believe we would be able to see the report, per se," that Novo prepared for BMO. (Exh. D86, 54:25–55:6) This assertion, however, contradicts Mr. Gupta's testimony about the acts of other members of the Squatrito family who did request to see the Lender Report. For example, when asked whether he recalled "talk[ing] about . . . [how] M[r]s. Squatrito had asked you about your findings in connection with [the Lender Report,]" Mr. Gupta replied, "I do." (8/11/25 Tr. 203:24–204:3) Accordingly, the Court concludes that, overall, the Squatritos did not appreciate the conflict that existed in its entirety.

67

respond to or address any concerns that CPI may have had are not to be found in the record. Scant evidence appears regarding whether Novo and CPI's management had any meaningful conversations on the subject at all while CPI contemplated hiring Novo. (8/11/25 Tr. 132:5–12; 8/13/25 Tr. 145:20–146:12) Novo's expert's lack of appreciation of this nondelegable duty is both disturbing and nonresponsive to this issue. The Court thus concludes, on the whole, and having reviewed the entire record, that Attorney Henzy's repeated and emphatic warnings were no substitute for the meaningful substantive disclosures and affirmations that Novo should have made to CPI.

Ultimately, as CPI's fiduciary, Novo bore the nondelegable burden of ensuring CPI's full, knowing, and intelligent waiver – not Attorney Henzy, and not BMO. Although Novo remarkably may have been "unaware of [Attorney] Henzy's concerns about Novo's potential conflict of interest and [the] potential risks of Novo being retained in bankruptcy prior to being engaged by CPI," as Novo asserts, as an experienced restructuring advisor, it was Novo's duty and province to foresee the attendant concerns and prospective consequences and make them known to CPI.[55] (Def. Post-Trial Brief, p. 10) Attorney Henzy may "never [have] addressed with Novo any of his concerns about Novo or [given] Novo the opportunity to address them," but that does not negate Novo's own paramount and nondelegable duty to properly disclose its own conflicts to its clients. (*Id.*; 8/13/25 Tr. 141:15–24; 8/13/25

---

[55] Again, it was not only Attorney Henzy who accurately foresaw that Novo could not be retained by CPI in a Chapter 11 bankruptcy, but also counsel for PUB. (Exh. P83, p. 1) Novo similarly should have foreseen this reality.

68

Tr. 161:7–16) Notably, Novo made no effort to explore their role in Attorney Henzy's reasons to withdraw as CPI's legal counsel. Novo adduced no evidence at trial that its disclosures were otherwise fulsome, adequate, or consistent with its independent obligations as CPI's fiduciary to inform CPI fully and adequately about the true extent of its conflict of interest. As Novo failed to discuss these subtleties or the prospective consequences of its retention by CPI, it breached the fiduciary duty of disclosure that it owed CPI.

### iii.   Novo's Conflict was Unwaivable

The Court concludes, in the alternative, that even if Novo's waiver was otherwise somehow adequate to inform CPI about a potential conflict and satisfy Novo's duty of disclosure, and that CPI somehow waived the conflict, the conflict that CPI purportedly waived under these facts and circumstances was unwaivable. *See* Gabriel Rauterberg & Eric Talley, *Contracting Out of the Fiduciary Duty of Loyalty*, 117 COLUM. L. REV. 1075 (2017) (noting that the duty of loyalty, while subject to limited corporate opportunity waivers, remains one of the few mandatory rules of corporate law); § 103(b). Effect of Partnership Agreement; Nonwaivable Provisions, Rev. Unif. P'ship Act Section 103 (2025–2026 ed.) (stating that, under the Revised Uniform Partnership Act, the duty of loyalty provided for under §§ 404(b) or 603(b)(3) and the duty of good faith and fair dealing provided for under § 404(d) cannot be eliminated, and the duty of care provided for under §§ 404(c) or 603(b)(3) cannot be unreasonably reduced).

Novo could not serve as CPI's fiduciary while still tethered to BMO, a party directly adverse to CPI. The Court acknowledges that Attorney Heimowitz opined that "[n]either Novo nor Mr. Gupta were adverse to CPI at the time of the [Novo/]CPI [E]ngagement," but finds that conclusion neither believable nor supported by the facts in the record. (Exh. P91, p. 35) As mentioned, Novo was still bound to the confidentiality clause contained in the BMO/Novo Retention Agreement, which prevented Novo from disclosing information it gathered *about CPI to CPI*. It was also naturally inclined, as a professional advisor, not to challenge its own Liquidation Analysis, developed only weeks or months prior, with alternate reorganization outcomes (*i.e.*, a capital raise, new Senior Lender advances, a partial sale or joint venture, a sale–leaseback, lender liability, and so forth). Furthermore, even though CPI's interests (to stay in business and receive increased funding and forbearance from BMO) were potentially opposed to BMO's interests (to reduce its losses), Novo had to simultaneously advance the interests of both entities – an impossible task. Finally, and most importantly, Novo's conflict was a concrete impediment to exploring the full scope of restructuring strategies, which included "[a]ssisting in developing a proactive public relations and communications program to ensure an orderly Chapter 11 process," even though Novo likely could not have represented CPI in a Chapter 11 or proceeded adversely against a BMO liquidation of CPI. (Exh. P4 at p. 3)

In sum, soberly considering all the irreconcilable dimensions and foreseeable consequences of the Novo/CPI Engagement, Novo was indeed "hopelessly

70

conflicted," as Attorney Henzy and Mr. Jalbert opined, and no amount of disclosure could remedy this situation. Accordingly, Novo could not and should not have accepted an engagement as CPI's CRO and financial advisor. Novo knew, or should have known, of these irreconcilable tensions, but instead chose to ignore its fiduciary duties, ostensibly in denial or in favor of its self-interest.[56]

### iv.    Conclusions and Damages

The Court concludes and adjudges that Novo did not meet its burden to show fair dealing, by clear and convincing evidence, and breached the fiduciary duties of loyalty and disclosure it owed CPI since the inception of, and during, the Novo/CPI Engagement. When a breach of fiduciary duty is shown, disgorgement is an appropriate equitable remedy, particularly where the harm resulting from the breach may be difficult to prove. *See* 2 Restatement (Third), Agency § 8.01, comment (d) (2), p. 259 ("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty. . . . Forfeiture may be the only available remedy when it is difficult to prove that harm to a principal resulted from the agent's breach or when the agent realizes no profit through the breach. In many cases, forfeiture enables a remedy to be determined at a much lower cost to litigants."). "Disgorgement wrests ill-gotten gains from the hands of a

---

[56] This was not Novo's first venture in serving as a CRO, assisting a company at risk of entering a Chapter 11 bankruptcy, or restructuring work. "Novo is a financial advisory firm that *specializes* in turnaround advisory, restructuring advisory, services, [CRO] services, interim CRO and interim chief executive officer services, crisis management, insolvency advisory, and various other restructuring and insolvency issues." (Stip. ¶ 15) (emphasis added) Mr. Gupta has "over two decades of experience guiding clients in distressed and turnaround matters," (MC – ECF No. 4, p. 1)

71

wrongdoer. . . . It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). *See also* Restatement (Third), Restitution and Unjust Enrichment § 51 ("Unless . . . subsection (2) imposes a greater liability, the unjust enrichment of a conscious wrongdoer, or of a defaulting fiduciary without regard to notice or fault, is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty. Restitution remedies that pursue this object are often called 'disgorgement' or 'accounting.'").

The Connecticut Supreme Court has confirmed that disgorgement is an appropriate remedy for breach of the fiduciary duty of loyalty, particularly where quantifying damages is difficult. *See Pompa*, *supra*, 324 Conn. at 734, 154 A.3d at 999. "Forfeiture may also have a valuable deterrent effect because its availability signals agents that some adverse consequence will follow a breach of fiduciary duty." *Id.* (quoting 2 Restatement (Third), *supra*, § 8.01, comment (d) (2), p. 259).

This Court likewise concludes and adjudges that disgorgement is an appropriate remedy here, where the harm resulting from the breach would be difficult to prove, and such a remedy affords Old CPI equitable relief. Further, the Court considers disgorgement an appropriate remedy where, as here, it is important to deter restructuring fiduciaries from breaching the fiduciary duties of loyalty and disclosure owed to debtors. Accordingly, the Court directs the disgorgement of the fees Novo earned from the Novo/CPI Engagement, totaling $1,167,036. (Stip. ¶ 30)

72

Such disgorgement, in good funds payable to the Liquidating Custodian, shall take place within 30 days hereof, unless stayed by a Court of competent jurisdiction upon posting an appeal bond or satisfactory escrow.

### e. Count Six: Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count Six, Old CPI asserts that Novo breached its implied duty of good faith and fair dealing pursuant to the Novo/CPI Engagement Contract. Old CPI alleges that Novo breached this duty by effectively misrepresenting that it could fully perform the obligations and duties outlined in the Engagement Contract – to (1) loyally serve as CPI's CRO and financial advisor and (2) shepherd CPI through a potential Chapter 11 reorganization, should the occasion arise – when it was unable to do so due to its conflict of interest. (ECF No. 1, p. 19–20) Old CPI further alleges that Novo impeded CPI's right to receive the material benefits of truly independent restructuring advice outlined in the Engagement Contract and that Novo did so in bad faith. (Plntff. Post-Trial Brief, p. 19–20)

In response, Novo asserts that it did not breach the terms of the Engagement Contract, nor did it act in bad faith. Novo contends that CPI received what it expected to receive under the Engagement Contract and that the evidence does not support the conclusion "that Novo or Mr. Gupta were hired in their respective roles as financial advisor and CRO in a bankruptcy." (Def. Post-Trial Brief, p. 31) Novo asserts further that "the requisite bad faith conduct" cannot be shown "because Novo was not engaged to provide services in the bankruptcy and CPI was aware in any event of potential risks with Novo being retained in a bankruptcy." (*Id.*, 32)

73

In Connecticut, "[i]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399, 142 A.3d 227, 237 (2016) (citing *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 432–33, 849 A.2d 382, 387–88 (2004) and *Landry v. Spitz,* 102 Conn. App. 34, 47, 925 A.2d 334, 341–42 (2007)). "Stated otherwise, the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty." *Landry*, *supra*, 102 Conn. App. at 47, 925 A.2d at 344. The implied covenant of good faith and fair dealing is also viewed as a "rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." *Harley v. Indian Spring Land Co.*, 123 Conn. App. 800, 837, 3 A.3d 992, 1016 (2010).

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies . . . actual or

74

constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." *Geysen*, *supra*, 322 Conn. at 399–400, 142 A.3d at 237–38 (quoting *De La Concha of Hartford, Inc., supra*, 269 Conn. at 433, 849 A.2d at 388). "[B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain." *Id.* (quoting *Elm Street Builders, Inc. v. Enter. Park Condo. Ass'n, Inc.,* 63 Conn. App. 657, 667, 778 A.2d 237, 243–44 (2001)). "[W]hen one party performs the contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, there is a breach of the covenant of good faith and fair dealing, and hence, a breach of contract, for which damages may be recovered." *Id.* (quoting *Landry*, *supra*, 102 Conn. App. at 44, 925 A.2d at 343). *See also Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 793–797, 67 A.3d 961, 986–987 (2013).

The parties agree that CPI bears the burden to prove the elements of a breach of the covenant of good faith and fair dealing by a preponderance of the evidence. *Whelan v. Brestelli*, 230 Conn. App. 683, 700, 331 A.3d 1220, 1233 (2025).

### i. Breach of the Covenant of Good Faith and Fair Dealing as CRO and Financial Advisor

The Court turns first to the contention that Novo breached the covenant of good faith and fair dealing by promising and failing to loyally serve as CPI's CRO and financial advisor. In the Novo/CPI Engagement Contract, Novo promised that

75

Mr. Gupta would "serve as [CPI's] Chief Restructuring Officer (CRO)" and that Novo would "provide certain financial advisory and consulting services," as set out more fully therein. (Exh. P4, p. 2) As described in Part 3.2.d, Novo and Mr. Gupta thereby became fiduciaries of CPI. Accordingly, Novo and Mr. Gupta owed CPI duties of undivided loyalty and disclosure, the benefits of which CPI reasonably expected to receive under the contract.

Novo and Mr. Gupta, by gross neglect, omission, denial, or disregard of duties, impeded CPI's right to receive these benefits. Neither Novo nor Mr. Gupta adequately disclosed the nature, consequence, and extent of the conflict of interest they faced in signing on as CPI's financial advisor and CRO while still bound to keep confidential the communications with BMO and the advice and opinions Novo presented to CPI's adversary, BMO, *about CPI*, and while still engaged in an institutional or prospective relationship with BMO that secured Novo business referrals and revenue. In such a posture, it was virtually unthinkable and near impossible for Novo to challenge BMO, or any liquidation objectives it had previously advanced on its behalf, while representing CPI.

The Court further concludes and adjudges that the acts and omissions by which Novo impeded CPI's right to receive its reasonably expected benefits under the Novo/CPI Engagement Contract were taken in bad faith. Novo's bad faith here consists of silence, gross neglect, material omissions, denial, and inaction – it did not properly disclose the nature, consequence, and extent of its actual, perceived, or potential conflicts to CPI. It either knew or should have known of these matters as

76

an experienced financial advisor. Nor did it deploy its strategic experience and expertise to loyally serve solely CPI to achieve its "best shot" at reorganization,[57] nor did it forthrightly disclose the belatedly acknowledged barriers to its retention in a Chapter 11 case. The Court concludes and adjudges that Novo clearly and grossly neglected to fulfill its fiduciary duties and contractual obligations under the Novo/CPI Engagement Contract in this regard not due to an honest mistake, but due to its denial and blind self interest in profiting from the Novo/CPI Engagement while maintaining its relationship with BMO. No meaningful or credible evidence was presented at trial concerning Novo's lack of knowledge or experience in failing to disclose the nature, consequences, and extent of the conflict of interest it faced. The hasty and chaotic way in which Novo was hired as CPI's CRO and financial advisor should have counseled more pause, more transparency, more caution, and a more reserved professional and ethical judgment. The monies that Novo could and did earn from the Novo/CPI Engagement in only six months sufficiently explain its self-interest, bad faith, and motivation for material deception by omission, gross neglect, and evasion of its fiduciary duties under both the letter and spirit of the bargain it struck with CPI.

Pursuant to this Count, CPI seeks "disgorgement of the CRO Payments or an award of money damages equal to the same." Due to Novo's bad faith and lack of fair dealing pursuant to the Novo/CPI Engagement, the Court concludes and adjudges that Novo should disgorge the CRO Payments of $1,167,036.00.

---

[57] Exh. P86 at 25:1–24.

### ii.    Breach of the Covenant of Good Faith and Fair Dealing as CRO and Financial Advisor in Contemplation of a Chapter 11 Filing

The Court turns next to Old CPI's contention that Novo breached the covenant of good faith and fair dealing by promising and failing to provide plenary professional assistance, experience, and expert guidance to CPI in the event of a Chapter 11 bankruptcy. Although Novo argues that it "was not engaged to provide services in [a potential Chapter 11] bankruptcy and CPI was aware in any event of potential risks with Novo being retained in a bankruptcy," neither of these contentions are credibly or logically supported by the indisputable and abundant evidence in the record. (Def. Post-Trial Brief, p. 32)

The Novo/CPI Engagement Contract expressly contemplates that Novo could and would provide services to CPI in the event of a Chapter 11 filing. Novo's counsel's contrary contentions are truthless. First, the terms of the Novo/CPI Engagement Contract expressly contemplate that Novo would support CPI in the event of a bankruptcy and would prepare for such an outcome. Therein, Novo promised to "[a]ssist [CPI] in developing a proactive public relations and communications program to ensure an orderly Chapter 11 process . . . ." (Exh. P4, p. 3) Contrary to Novo's intentional misdirection on this clause, this provision clearly and plainly illustrates that Novo agreed to assist CPI in the event of a potential bankruptcy and does not portray a Chapter 11 bankruptcy as a remote possibility. Implicit in such a provision is Novo's representation that Novo *could* reasonably be engaged to provide such services were CPI to file for bankruptcy. Other provisions

78

of the Novo/CPI Engagement Contract similarly indicate that bankruptcy was not a remote possibility.[58] The facts and circumstances surrounding CPI's critical reliance on Novo and CPI's later expense of additional resources to pivot to another financial advisor cannot be simply ignored in this context.

Second, the Eighth Forbearance Agreement – which went into effect on November 1, 2020, while Novo served as CPI's CRO and financial advisor, but before CPI's bankruptcy filing – again clearly contemplates that Novo would support CPI and continue to serve as its CRO and financial advisor in the event of a bankruptcy. In Exhibit C to that Agreement, the Chapter 11 Restructuring Term Sheet expressly references Novo under the section entitled "Borrower's Management." (Exh. P19, p. 47) That section states that Novo would continue as CRO and allocates monthly borrowings to be set aside to cover Novo's monthly fees.[59] (*Id.*) Another section, entitled "Professional Fees," states that "[u]pon CPI's entering Chapter 11, Lenders will support interim fee procedures providing for monthly payment of 50% of incurred professional fees for Borrowers' counsel and Novo . . . ." (*Id.*) Novo is referenced elsewhere throughout the document, too, rebutting the patently false and misleading assertion that Novo was not engaged to

---

[58] For example, the Contract extensively discusses how fees and expenses would be paid "[i]n a case under the Bankruptcy Code," should a bankruptcy ensue. (Exh. P4, p. 5–6)

[59] The section reads in full:

> Novo Advisors ('Novo') to continue as CRO. Upon entering Chapter 11, Lenders consent to approval of monthly borrowings under the DIP Facility equivalent to payment of 50% of Novo's monthly fees, with the balance to paid from sale proceeds.
>
> CPI shall also cause its management team and the Investment Banker to be made available to provide periodic telephone updates to the Administrative Agent and the Lenders from time to time as reasonably requested by the Administrative Agent.

(Exh. P19, p. 47)

provide services in a potential Chapter 11 bankruptcy, as well as the unsubstantiated contention that CPI was aware of the potential risk that Novo would not likely be retained in a bankruptcy.[60]

Third and finally, when CPI eventually *did* file for bankruptcy on February 8, 2021, CPI clearly anticipated that Novo could and would serve as its CRO and financial advisor. CPI filed an application to employ Novo as such, further rebutting Novo's absurd contention that CPI did not rely on Novo "to undertake the responsibility of guiding CPI through the process of filing for bankruptcy and serving as its post-petition CRO and financial advisor." (Def. Post-Trial Brief Rebuttal, p. 18 (ECF No. 128); Application to Employ Novo Advisors (MC–ECF No. 123)) It was not until March 1, 2021, that CPI withdrew its application to employ Novo after Novo finally acknowledged the insurmountable obstacles to its retention and the imminent opposition from parties in interest and informed CPI that it was accordingly terminating the Engagement.[61] (MC – ECF No. 193; 8/13/25 Tr. 162:25–163:4)

The evidence abundantly illustrates that Novo was engaged, in part, to provide services in a potential Chapter 11 bankruptcy and that Novo did not make

---

[60] Courts in the Second Circuit have consistently applied the Jay Alix Protocol when considering the retention of bankruptcy professionals. *See In re Saint Vincents Cath. Med. Ctrs. of N.Y.*, 2007 WL 2492787 at *14 (Aug. 29, 2007) (noting that an assertion that the Jay Alix Protocol might not be applied in the Southern District of New York "is unsupported"); *In re Nine West Holdings*, 589 B.R. 679, 687–88 (Bankr. S.D.N.Y. 2019); *In re K.G. IM, LLC*, 620 B.R. 469, 486 (Bankr. S.D.N.Y. 2020); *In re Genever Holdings, LLC,* No. 20-12411-JLG, 2021 WL 3919826, at *13 (Bankr. S.D.N.Y. Sept. 1, 2021). This Court likewise would support its application to Chapter 11 cases in Connecticut.

[61] Mr. Gupta testified that Novo was "informed by [CPI's] counsel at the time . . . that there was a risk of a potential conflict being raised by the unsecured creditors committee or the U.S. Trustee or both, I can't recall which." (8/13/25 Tr. 162:25–163:4)

CPI aware of the potential risks and disruptive consequences that would result if Novo could not ultimately be retained in a Chapter 11 due to judicial scrutiny of its conflict of interest resulting from its work for BMO.[62] CPI reasonably and naturally expected to receive the unfettered benefits of Novo's professional assistance in a potential Chapter 11 under the Novo/CPI Engagement Contract. Those benefits were already denied here the day Novo undertook the Novo/CPI Engagement.

The Court further concludes that the acts and omissions by which Novo impaired CPI's right to receive its reasonably expected benefits under the Novo/CPI Engagement Contract were taken in bad faith. Novo's bad faith here again consists of inaction, gross negligence, disregard of its duties, and calculated material omissions. As a financial advisory firm offering its wide expertise in bankruptcy and restructuring, it knew or should have known its limitations and communicated them to CPI with full disclosure of all material facts. (Stip. ¶ 15; 8/11/25 Tr. 36:6–24) Accordingly, the Court concludes that Novo's motivations in offering CPI services in contemplation of a Chapter 11 filing that it could not or likely could not provide, were self-interested and calculated, and involved material omissions, gross neglect, and disregard of duties by a fiduciary, and thus were in bad faith. Novo accordingly breached the covenant of good faith and fair dealing contained in the CPI/Novo Engagement Contract.

---

[62] This application perhaps also evidences Novo's sincere belief that it could serve as CPI's CRO and financial advisor. Given Novo's expertise and its promises under the Engagement Contract, however, it bears the responsibility for that mistaken belief. Conversely, it is possible and more likely that Novo knew of these obstacles and chose to ignore them in pursuit of its own self-interest.

81

### iii.   Conclusions and Damages

In sum, the Court concludes that Novo breached the implied covenant of good faith and fair dealing in its Engagement Contract with CPI. Pursuant to this Count, Old CPI again seeks "disgorgement of the Novo Transfers and CRO Payments or an award of money damages equal to the same." (ECF No. 1, p. 20) Due to Novo's breach of the implied covenant of good faith and fair dealing, the Court concludes and adjudges that Novo must disgorge the CRO Payments of $1,167,036.00 for the same reasons articulated in Part 3.2.d.iv of this Memorandum of Decision. Such disgorgement, in good funds payable to the Liquidating Custodian, shall take place within thirty days hereof, unless stayed by a Court of competent jurisdiction upon posting appeal bond or satisfactory escrow.

### f.   Count Seven: Violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b, et seq.

In Count Seven, Old CPI alleges that "Novo engaged in conduct, acts, and/or omissions that [were] unlawful, unfair, immoral, unethical, oppressive, and/or unscrupulous and/or of a nature that cause[d] substantial injury to consumers or businesspersons with the meaning, and in violation, of CUTPA . . . ." (ECF No. 1, p. 20) Specifically, Old CPI alleges that Novo violated CUTPA through its:

1. "use [of] its knowledge of CPI's precarious financial condition and its relationship with BMO to [prey] upon CPI at its most vulnerable time in order to secure its retention by CPI and charge CPI for services;"

2. representations "to CPI that it was capable of performing the obligations and duties it was required to perform under the retention agreement when in fact it was unable to do so as a result of its conflict of interest, and its prior and ongoing relationship with BMO;"

82

3. charging of CPI "for services it was unable to provide in whole or in part as a result of its prior and ongoing relationship with BMO;" and

4. role in causing "CPI to borrow funds and increase its indebtedness on the eve of its bankruptcy filing for the sole purpose of" enabling CPI to make the Pre-Petition BMO Payment, which led Novo's outstanding invoices associated with its engagement with BMO to be paid.

(*Id.*, 20–21) Old CPI alleges that CPI suffered an ascertainable loss of money or property due to Novo's conduct, and that Novo's conduct evinces a reckless indifference to CPI's rights and/or the intentional and wanton violation of those rights. (*Id.*) Herein, the Court adopts as findings the first three aforesaid allegations and rejects only the fourth allegation.

In response, Novo argues that the CUTPA claim is inapplicable as it relates to Mr. Gupta as CRO "because it is premised on an intra-corporate dispute between a company and its temporary officer that is untethered from either deception or a consumer relationship." (Def. Post-Trial Brief, p. 33) Further, Novo asserts that CPI "has not adduced evidence that Novo's conduct was deceptive," "that the CPI Engagement 'cause[d] substantial harm to consumers," or "that [Novo] was unable to perform its obligations under the CPI Engagement." (*Id.*, 34) These arguments are unavailing and are rejected by the Court.

Connecticut General Statutes § 42–110b(a) provides that: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

> It is well settled that in determining whether a practice violates CUTPA [the Connecticut Courts] have adopted the criteria set out in the [C]igarette [R]ule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice,

83

without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice.

*Ulbrich v. Groth*, 310 Conn. 375, 409–410, 79 A.3d 76, 100 (2013) (citing *Harris v. Bradley Mem'l Hosp. & Health Center, Inc.*, 296 Conn. 315, 350–51, 994 A.2d 153, 173 (2010)).

"Whether a practice is unfair and thus violates CUTPA is an issue of fact. . . . The facts found must be viewed within the context of the totality of circumstances which are uniquely available to the trial court." *De La Concha of Hartford, Inc.*, *supra*, 269 Conn. at 434, 849 A.2d at 387 (quoting *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 714–15, 746 A.2d 184, 193 (2000)). *See also Harley*, *supra*, 123 Conn. App. at 835, 3 A.3d at 1015. A "single transaction or act of misconduct can[] constitute a violation of CUTPA and [a violator of CUTPA need not engage] in similar types of unfair or deceptive practices with more individuals . . . for the court to find properly that [its] actions constituted a CUTPA violation." *Hart v. Carruthers*, 77 Conn. App. 610, 619–20, 823 A.2d 1284, 1290 (2003). Thus, this

Court must assess the totality of the facts and circumstances and apply the Cigarette Rule to determine whether Novo's conduct violated CUTPA.

First, the Court concludes that Novo's acts concerning CPI offend public policy. It is indeed unfair, unethical, unscrupulous, and a detriment to public policy, as demonstrated by the evidence that Novo has breached its fiduciary duty owed to CPI and further breached the implied covenant of good faith and fair dealing. But the Court also finds that it was manifestly offensive, unfair, and unethical for Novo to promise CPI that it could perform its duties under the Novo/CPI Engagement Contract – both as a fiduciary owing Novo its undivided loyalty and as a CRO and advisor poised to shepherd CPI through a potential bankruptcy – when either Novo could not perform those duties or it was substantially unlikely that Novo would be approved by the Court to perform those duties due to its prior and ongoing relationship with BMO. Similarly, it was manifestly offensive, unfair, unscrupulous, and unethical for Novo to charge CPI for a range of services that it was likely impossible or near impossible for Novo to provide. Accordingly, given the facts in this case illustrating Novo's debilitating conflict of interest that prevented it from honoring the duty of unfettered loyalty owed and from strategically shepherding CPI through a prospective reorganization, as the Engagement Contract contemplated, the Court concludes that the first prong of the Cigarette Rule is satisfied.

Second, as to whether Novo's acts were immoral, unethical, oppressive, or unscrupulous, the Court concludes that this prong is satisfied. Novo's conduct was

85

certainly immoral and unethical, as it is immoral and unethical to simultaneously represent two adverse entities without fully disclosing the extent of the conflict of interest, and particularly when serving as an officer of one of the entities. The various codes of conduct and ethical standards referenced at trial by Mr. Jalbert affirm that such a decision was unethical and at variance with customary practice, industry standards, and fiduciary obligations. For example, by analogy, the American Bar Association concludes that a conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." A.B.A. 1.7, Conflicts of Interest. This professional standard or guideline of fiduciary conduct is manifestly breached here.

Similarly, the standard of the Turnaround Management Association, of which Mr. Gupta is a member, states that "a member's duty is solely to the client and he or she should strive to remain independent of other affiliations that could compromise his or her judgment or result in the appearance of compromise. Prior to accepting an engagement, a [TMA] member shall disclose to his or her client all financial relationships which may cloud, or give the appearance of clouding, his or her judgment. If the client is the troubled business or organization, disclosure shall be made of any past referrals from, prior work for, or an ownership interest in, any owner, creditor or customer of the client and any party offering appearance of conflicts of interest." Turnaround Mgmt. Ass'n, Code of Ethics, Canon II, Sec. 2.2. Again, this standard or guideline of fiduciary conduct is manifestly violated here in

86

Novo's decision to accept an engagement with CPI when it previously worked on an engagement *about CPI for BMO's benefit*, and while it still had an ongoing institutional relationship with BMO. Novo's decision was immoral, unscrupulous, and unethical, whether judged against industry standards, custom, the Jay Alix protocol, or common sense ethics for fiduciaries.[63]

Novo's conduct was also unethical pursuant to the standards issued by the Association of International Certified Professional Accountants (AICPA), as well. The Code of Professional Conduct promulgated by the AICPA, section 1.100.01 (.01) states that "In the performance of any *professional* service, a *member* shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others." Ass'n Int'l Certified Pro. Accts. Code of Pro. Conduct (Dec. 15, 2014), p. 52 (emphasis in original). Thereafter, section 1.110.010 (.02) states, "A conflict of interest creates adverse interest and self-interest *threats* to the *member's* compliance with the"

---

[63] It is not uncommon for Courts to consider an expert's synthesis of industry and ethical standards when determining whether a party met its ethical obligations. *See Winkelmeyer v. DePuy Orthopaedics, Inc.,* No. 2:13-CV-04058-MDH, 2023 WL 12179413, at \*4–\*6 (W.D. Mo. Aug. 15, 2023) (observing that an expert's opinions regarding industry standards generally can assist the trier of fact in determining the requisite standard of care); *In re Bloom,* 622 B.R. 366, 401 (Bankr. D. Colo. 2020), *aff'd,* 634 B.R. 559 (10th Cir. BAP (Colo.) 2021), *aff'd,* No. 22-1005, 2022 WL 2679049 (10th Cir. July 12, 2022) (wherein ethical industry standards, though not binding and enforceable by a regulatory body, were considered and deemed to illustrate general tenets that aircraft brokers must abide by); *In re DePuy Orthopaedics, Inc.,* No. 3:11-MD-2244-K, 2016 WL 6271474, at \*5 (N.D. Tex. Jan. 5, 2016) (concluding that "ethical standards may be helpful to [the fact finder] when ethical obligations are of consequence to the issues to be decided by the [fact finder], such as an attorney's ethical obligations in a breach of fiduciary duty claim or a physician's standard of care in claims of negligence."); *In re Johnson & Johnson Talcum Powder Prods. Mktg.,* No. 3:16-MD-2738 (MAS) (RLS), 2026 WL 161184, at \*212 (D.N.J. Jan. 20, 2026) (explaining that "experts may explain the regulatory framework and industry standards that inform a . . . standard of care and may assess compliance with those standards" to assist the finder of fact); *Lehmann v. Louisville Ladder Inc.,* 610 F. Supp. 3d 667, 688 (E.D. Pa. 2022) (considering industry standards, though not dispositive, as probative regarding whether a party's assessment of risks and utilities were reasonable).

aforementioned requirement of 1.100.01 (.01) to maintain objectivity and integrity, to be free of conflicts of interest, and to not knowingly misrepresent facts or subordinate one's judgment to others. *Id.*, 53 (emphasis in original) The Code cites, as an example of a situation wherein adverse interest and self-interest threats may arise, "the member or the member's firm provides a professional service related to a particular matter involving two or more clients whose interests with respect to that matter are in conflict." *Id*. Here again, Novo's conduct clearly violated the AICPA Code of Professional Conduct, demonstrating and that Novo's conduct was unethical and unscrupulous. Although Novo was not acting as CPI's CPA, the standards to which the AICPA holds its members are illustrative of the ethical industry standards that comparable professionals are held to when working intimately with their client's finances, as Novo did. As CPI's financial advisor and CRO, Novo did not comport itself ethically within the boundaries of CPAs.

Novo's conduct was furthermore unscrupulous because Novo essentially lied to CPI about its qualifications and ability to assist CPI in the event of a bankruptcy. As noted prior, Novo communicated to CPI multiple times that its intent was to assist CPI in the event of a Chapter 11 filing. *See* Part 3.2.e.ii of this Memorandum of Decision. Novo thereby deprived CPI of the opportunity to find a full service CRO and financial advisor that *could* loyally represent its interests and shepherd it through bankruptcy, which ultimately led Novo to incur greater expenses when the time came that Novo could not represent CPI any longer. Recall that CPI had multiple interviews with alternative financial advisors scheduled prior to hiring

88

Novo, including one with Phoenix, but those interviews were cancelled as CPI was increasingly pressured toward Novo. (8/12/25 Tr. 53:8–17; 8/13/25 Tr. 24:12–21) Ultimately, when CPI had to find and engage a new financial advisor and CRO upon Novo's termination, it filed an application to hire Phoenix (MC – ECF No. 194), which this Court approved. (MC – ECF No. 326) Thereafter, Phoenix charged CPI "hundreds of thousands of dollars" "to come up to speed" in the midst of a Chapter 11 case. (8/13/25 Tr. 219:24–220:7) Mr. Jalbert opined that the costs he reviewed were "a pretty good proxy for what it would have cost" any firm to get up to speed at that juncture. (*Id.*) Similarly, Mr. Heimowitz attributed $404,255 to the cost CPI incurred as Phoenix got up to speed in March and April of 2021, with $241,635 in billable fees, not including expenses, for the period of March 1–31, 2021, and $162,620 in billable fees, not including expenses, for the period of April 1–30, 2021. (Exh. D91, p. 30 n.91; MC – ECF No. 393 (showing $241,635 billed in March of 2021); MC – ECF No. 583 (showing $162,620 billed in April of 2021))

Mr. Jalbert aptly summarized the attendant issues with Novo's representation in his Expert Report: "Novo never should have taken both engagements and further exacerbated the situation by failing to fully inform CPI of the contents of [the Senior Lender Report] . . . In all my years as a financial advisor, CRO and fiduciary, I have never considered representing both sides in an engagement without express disclosure and written permission by both sides. Even then, in this situation, based on these facts, I would not have accepted the CPI engagement given the clear conflict, my knowledge of confidential information of

89

adverse counterparties, and the adverse relationship between a borrower and a lender (particularly in connection with a potential bankruptcy filing)." (Exh. P91, p. 11)

The Court agrees with Mr. Jalbert that Novo should not have accepted the engagement and that it was improper and unethical for Novo to do so. Although the Court agrees with Attorney Heimowitz's conclusion that the standards that Mr. Jalbert cited are, in some instances, guidelines and are not necessarily dispositive, here these standards are relevant to weighing the fundamental standards of care for a fiduciary. As a fiduciary, Novo owed an even higher standard of care than these alleged guidelines proscribe, but fell far short. "The fiduciary relation demands something more than the morals of the market place." *Guth*, *supra*, 23 Del. Ch. at 282. Novo's blindness to ethics, fair dealing, moral civility, and custom and practice in this industry do not vindicate its acts, omissions, and practices.

In sum, Novo did not treat CPI honestly or fairly by effectively misleading CPI about its relationship with BMO and its ability therefore to fully and loyally serve as CPI's financial advisor, CRO, and fiduciary. Thus, the Court concludes and adjudges that the second prong of the Cigarette Rule is abundantly satisfied.[64]

As to the third and final prong of the Cigarette Rule, the Court concludes that Novo's conduct caused substantial injury to CPI as a consumer and to other

---

[64] The Court acknowledges that both Attorney Heimowitz and Mr. Jalbert referred to various ethical standards in deriving their opinions, embodied in their Expert Reports, about whether Novo's conduct was ethical. For example, both Attorney Heimowitz and Mr. Jalbert reference and discuss the Model Rules of Professional Conduct promulgated by the American Bar Association and the Turnaround Management Association's Code of Ethics (Exh. D91, p. 27–28; Exh. P91, p. 5–6) The Court concludes that these ethical standards, although illustrative, are not dispositive, under these facts and circumstances, of whether Novo breached its duties as a fiduciary or violated CUTPA.

consumers. CPI was deprived of the unfettered and unbiased professional services Novo promised to deliver and ultimately had to hire a new CRO and financial advisor during its bankruptcy as a result, requiring CPI to take on additional financial burdens and the onboarding of new advisors when it was already in a period of serious financial distress. Furthermore, to allow a fiduciary to profit off an improvident engagement while unable to meet the duties of undivided loyalty and adequate disclosure owed causes substantial injury to other consumers and commerce generally, as it erodes the standards to which professionals are held, on which parties and this Court rely, and the policies underlying those standards.[65]

In sum, the Court concludes and adjudges that all three prongs of the Cigarette Rule are satisfied here, even though all three need not be met to support a finding of unfairness. *Ulbrich*, 310 Conn. at 409, 78 A.3d at 100. CPI has successfully proven that Novo engaged in unfair and deceptive practices through its conduct and omissions in the Novo/CPI Engagement and that Novo thus violated CUTPA. The damages that this Court awards pursuant to this Count will be discussed in Section 4 of this Memorandum of Decision.

---

[65] *See* Daniele Marchesani, *A New Approach to Fiduciary Duties and Employees: Wrongful Discharge in Violation of Public Policy*, 75 U. CIN. L. REV. 1453, 1472 (2007) ("Fiduciary obligations, then, are not just a matter of private economic relationships; rather, they serve as one of the essential pillars of corporate law and of the entire economic system. They are an indispensable legal tool, which makes corporations efficient economic engines for the benefit of the entire society. The fundamental public policy that the fiduciary duties embody, therefore, is that of promoting collective economic activity in order to increase the well being of the entire community."); Melvin Aron Eisenberg, *The Structure of Corporation Law*, 89 COLUM. L. REV. 1461, 1523–24 (1989) (discussing the importance of fiduciary duties and noting that "permitting publicly held corporations to vary core fiduciary and structural rules if they did so before they went public might well lead to inefficiency in the national economy" because "a significant portion of our national economy could eventually come to be vested in the hands of corporations in which inefficient managers were not effectively accountable and could not be easily removed," which "could both jeopardize the efficiency of the economy and put the legitimacy of the corporate system into question.").

## 4. Damages

As Old CPI has prevailed on Counts Five and Six, the Court once again concludes and adjudges that the disgorgement of the CRO Payments is proper for the reasons articulated in Parts 3.2.d and 3.2.e of this Memorandum of Decision. The Court further concludes that Old CPI shall receive pre-judgment interest and costs on the $1,167,036.00 owed, determined as of the day the Complaint was filed.[66] The Court also concludes and adjudges that the awarding of reasonable attorneys' fees and expenses for Novo's violation of CUTPA[67] as well as the aforesaid breaches of fiduciary duty[68] is appropriate in this case.

Although Old CPI has prevailed on Count Seven regarding Novo's violation of CUTPA, Old CPI does not seek specific damages on this Count in the Complaint. The Complaint, however, generally seeks "Avoidance of all Novo Transfers;" "[a]n order directing that the Novo Transfers be set aside;" "[r]ecovery of the Novo Transfers, or the value thereof for the benefit of the estate of the Debtor; plus any profits generated therefrom, from [Novo] for the benefit of [CPI's] estate and its creditors;""[a]n injunction against [Novo] prohibiting them from further disposing of

---

[66] "Under Connecticut law, 'interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable.' Conn. Gen. Stat. § 37-3a(a). '[A]n award of interest under § 37–3a . . . is discretionary with the trial court. Interest is awarded . . . when the court determines that such an award is appropriate to compensate the plaintiff for the loss of use of [its] money.' *DiLieto v. Cnty. Obstetrics & Gynecology Grp., P.C.*, 310 Conn. 38, 54, 74 A.3d 1212 (2013)." *McCarter & Eng., LLP v. Jarrow Formulas, Inc.*, 715 F. Supp. 3d 281, 316 (D. Conn. 2024).

[67] "In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, *costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. . . .* In any action brought under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief." Conn. Gen. Stat. § 42-110g(d) (emphasis added).

[68] *See Chioffi v. Martin*, 181 Conn. App. 111, 141, 186 A.3d 15, 34 (2018) ("[A]ttorney's fees may, where found to be appropriate, be allowed as damages for breach of fiduciary duty.").

92

the Novo Transfers;" "[m]oney damages;" "[d]isgorgement of the Novo Transfers;"

"[d]isgorgement of the CRO Payments;" "[a]ttorneys' fees;" "[p]unitive damages;"

"[p]re-judgment interest and costs;" and "[s]uch other and further relief as this

Court deems just and equitable." (ECF No. 1, p. 23)

Pursuant to Count 7, the Court concludes and adjudges that Novo should

disgorge the CRO Payments of $1,167,036.00. Furthermore, considering the

egregiousness of Novo's conduct, the Court also grants Old CPI punitive damages in

this case, as are permitted under Connecticut General Statutes § 42-110g(a). " . . .

[T]he CUTPA statutes do not provide a method for determining punitive damages . .

. ." *Herron v. Daniels*, 208 Conn. App. 75, 102, 264 A.3d 184, 204 (2021). Section 42-

110g merely states, "[t]he court may, in its discretion, award punitive damages . . .

as it deems necessary and proper." Accordingly, "punitive damage awards for

CUTPA violations do not follow a consistent pattern of application or calculation"

and Courts are left to their discretion. Mark K. Ostrowski & Brooke E. Havard,

*Punitive Damages under the Connecticut Unfair Trade Practices Act*, THE DEFENSE

8 (Summer 2008).

"[I]n order to award punitive or exemplary damages, evidence must reveal a

reckless indifference to the rights of others or an intentional and wanton violation of

those rights." *Wagner v. Our Lady of Mount Caritas, O.S.B., Inc.*, 157 Conn. App.

788, 801, 118 A.3d 103, 111 (2015) (quoting *Berry v. Loiseau,* 223 Conn. 786, 811,

614 A.2d 414, 427 (1992)). "In fact, the flavor of the basic requirement to justify an

award of punitive damages is described in terms of wanton and malicious injury,

93

evil motive and violence." *Herron v. Daniels*, 208 Conn. App. 75, 102, 264 A.3d 184, 204 (2021) (citing *Ulbrich*, *supra*, 310 Conn. at 446, 78 A.3d at 121–22).

The Court concludes that the evidence indeed reveals Novo's "reckless indifference to [CPI's] rights" and its professional obligations, particularly in that Novo disregarded CPI's right to receive the undivided loyalty and fulsome disclosure it owed CPI as a fiduciary, CRO, and Financial Advisor. *See Advanced Fin. Servs., Inc. v. Associated Appraisal Servs., Inc.,* 79 Conn. App. 22, 34, 830 A.2d 240, 250 (2003).

The Court further concludes that Novo acted with such reckless indifference to CPI's rights because its self-serving motive was to profit off of CPI's distress while maintaining its institutional relationship and building rapport with BMO. Indeed, the Court agrees with Mr. Jalbert's opinion that "Novo was not acting in the best interest of CPI but rather in its own self interests" and that Novo cruelly and intentionally disregarded CPI's rights toward that end, injuring CPI in that it hired an advisor and officer that could not impartially represent its interests and in that it ultimately had to hire a substitute financial advisor and CRO. (Exh. P91, p. 9) The Court concludes and adjudges that the award of punitive damages here serves "to vindicate the purpose of the unfair trade practices statute which is to dissuade business activities which are unfair or deceptive." *Rossman v. Morasco*, No. X-08-CV-010183603-S, 2006 WL 2411475, at *3 (Conn. Super. Ct. July 31, 2006).

Courts often award multiples of the underlying damage award as punitive damages. *Id*. This Court concludes, however, that Novo's conduct here warrants a

94

more measured sanction given that some of Novo's efforts on operational performance arguably improved CPI's business. (8/11/25 Tr. 72:20–24, 108:2–11; 8/13/25 Tr. 162:1–13) Accordingly, this Court awards $273,616.25 in punitive damages to Old CPI. This amount equals and represents the sum that Novo received for its work on the BMO/Novo Retention Agreement, investigating CPI on BMO's behalf. This element of the award effectively strips Novo of any earnings related to CPI's insolvency. The Court concludes and adjudges that such a sum will appropriately deter Novo, and others like it, from engaging in duplicitous conduct, material omissions, and disregard of ethical boundaries, and that this sum, in measured restraint, disgorges Novo of its earnings from BMO and thereby appropriately punishes Novo for its wrongdoings and omissions. Furthermore, this award recognizes the rights of consumers of such services to be free from such wrongdoing, which the legislature sought to protect by enacting CUTPA.[69]

In sum, the Court grants judgment in favor of Old CPI on Counts Five, Six, and Seven, and concludes and adjudges that disgorgement of the fees Novo earned from the Novo/CPI Engagement is appropriate to these claims. Accordingly, the Court awards CPI the sum of $1,167,036.00, plus interest, in equitable disgorgement. The Court further awards Old CPI punitive damages of $273,616.25, and reasonable attorneys' fees and expenses (to be determined). The payment of these sums by Novo (other than the to-be-determined attorneys' fees and expenses),

---

[69] When punitive damages are awarded pursuant to § 42-110g(a), both punishment and deterrence are proper purposes for such an award. *Ulbrich*, *supra*, 310 Conn. at 454 n.64, 78 A.3d at 126 n.64 (citing *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 861 F. Supp. 1132, 1139 (D. Conn. 1994) and *Harty v. Cantor Fitzgerald & Co.*, 275 Conn. 72, 97, 881 A.3d 139, 155–56 (2005)).

95

in good funds payable to the Liquidating Custodian, shall take place within thirty (30) days hereof, unless stayed by a Court of competent jurisdiction upon posting an appeal bond or satisfactory escrow.

Counsel for Old CPI accordingly is ordered and directed to file with the Court a Declaration and Application for prejudgment interest and reasonable attorneys' fees and expenses within thirty (30) days hereof. Any response to that claim shall be filed by the Senior Lenders within fifteen (15) days thereafter. After notice and a hearing, this Court will enter a Supplemental Judgment related thereto.

### 5.  Conclusions

For the foregoing reasons, the Court finds for the Plaintiff on the counts for Breach of Fiduciary Duty as to the Novo/CPI Engagement and Violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b, et seq. Further, for the foregoing reasons, and the reasons explained in this Court's earlier Memorandum of Decision Granting Judgment on Partial Findings as to Count One (ECF No. 120), the Court finds for the Defendant on Count One, Two, Three, and Four.

Accordingly, this Court awards Old CPI a Judgment in the amount of $1,167,036.00, plus prejudgment interest, on Counts Five, Six, and Seven to disgorge Novo of the CRO Payments, as well as punitive damages in the amount of $273,616.25 on Count Seven. After notice and hearing, the Court will issue a Supplemental Judgment to quantify any pre-judgment interest due and the reasonable costs and attorneys' fees to be awarded herein.

The aforesaid Judgment shall entitle the Plaintiff to a single recovery of said sums. *See Meribear Prods., Inc. v. Frank*, 328 Conn. 709, 722, 183 A.3d 1164, 1171 (2018) (observing that where a Complaint "involves claims that present alternative theories of recovery for the same injury, but are not legally inconsistent[,] . . . there is no legal impediment to the trier of fact finding that the plaintiff has established both claims, although the plaintiff can recover only once for the same injury."); *Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed.").

The Clerk of Court shall cause a separate Judgment consistent with this Memorandum of Decision and the Court's earlier Memorandum of Decision Granting Judgment on Partial Findings as to Count One (ECF No. 120) to promptly enter upon the docket of this Adversary Proceeding. Any Supplemental Judgment, described herein, shall enter in due course after notice and hearing.

IT IS SO ORDERED at Hartford, Connecticut this 17th day of March 2026.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut